NO. 22-70007

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

JARRELL NEAL,
*Petitioner – Appellee*

v.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY,
*Respondent – Appellant*

---

Appeal from the United States District Court for
The Eastern District of Louisiana, No. 2:15-CV-5390,
The Honorable Chief Judge Nannette Jolivette Brown, Presiding

---

## BRIEF OF APPELLANT DARREL VANNOY,
## WARDEN, LOUISIANA STATE PENITENTIARY

---

**PAUL D. CONNICK, JR.**
**DISTRICT ATTORNEY**
24th JUDICIAL DISTRICT
STATE OF LOUISIANA

Thomas J. Butler (La. Bar No. 22982)
Matthew R. Clauss (La. Bar No. 31664)*
Assistant District Attorneys
Office of the District Attorney
200 Derbigny Street
Gretna, Louisiana 70053
Telephone: (504) 368-1020

*Counsel for Respondent – Appellant*

## CERTIFICATE OF INTERESTED PERSONS

NO. 22-70007

JARRELL NEAL
*Petitioner – Appellee*

*v.*

DARREL VANNOY, WARDEN
LOUISIANA STATE PENITENTIARY
*Respondent – Appellant*

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of 5th Cir. R. 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. Respondent-Appellant, Darrel Vannoy, Warden, appears herein in his official capacity only.

**Appellant:**

Darrel Vannoy, Warden
Louisiana State Penitentiary
17544 Tunica Trace
Angola, LA 70712

**Counsel for Appellant:**

Paul D. Connick, Jr.
District Attorney, 24th Judicial District
Thomas J. Butler
Matthew R. Clauss
Assistant District Attorneys
Office of the District Attorney
200 Derbigny Street
Gretna, Louisiana 70053

**Appellee:**

Jarrell Neal

**Counsel for Appellee:**

Cecelia Trenticosta Kappel
Capital Appeals Project of New Orleans
1024 Elysian Fields Avenue
New Orleans, LA 70117

Rachel I. Conner
Conner & Southern
3015 Maganine Street
New Orleans, LA 70115

**Other Interested Parties:**

Jeff Landry
Attorney General
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, LA 70802

Stephen T. Wimberly
Juliet L. Clark
Assistant District Attorneys
Office of the District Attorney
200 Derbigny Street
Gretna, Louisiana 70053

Dated: September 14, 2022

/s/ Matthew R. Clauss
Assistant District Attorney
Attorney of Record

iii

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(2) and 5th Cir. R. 28.2.3, Respondent-Appellant, Darrel Vannoy, respectfully suggests that oral argument may be likely to assist this Court in deciding this matter.

The main issue presented for review to this Court is whether the federal district court below faithfully adhered to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) when it granted Petitioner habeas corpus relief and vacated Petitioner's 1998 convictions for first-degree murder. First, the district court clearly erred in disregarding the state-court factual finding, that Petitioner's trial counsel acted strategically or tactically, without affording this determination a presumption of correctness or requiring Petitioner to rebut this determination with clear and convincing evidence. Second, the district court erred in determining that Petitioner has satisfied the "unreasonable application" exception to AEDPA's relitigation bar. Third, even if Petitioner could overcome AEDPA's relitigation bar, Petitioner is not entitled to habeas relief because he cannot prove he received ineffective assistance of counsel pursuant to *Strickland v. Washington*.

Oral argument may correspondingly assist the Court in focusing on the correct legal standard under AEDPA and in properly analyzing the state court decision applying *Strickland v. Washington* using the correct legal standard.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................iv

TABLE OF CONTENTS ....................................................................................v

TABLE OF AUTHORITIES ..............................................................................vii

STATEMENT OF JURISDICTION .....................................................................1

ISSUES PRESENTED FOR REVIEW ..................................................................1

STATEMENT OF THE CASE ............................................................................ 2

   I.    Statement of the Facts .................................................................. 2

     A.  Murders at midnight. ................................................................. 2

     B.  Witnesses hear gunshots, immediately see perpetrators fleeing Claudette Hurst's house, and are fired upon. ...............................................5

     C.  An off-duty Sherriff's deputy sees Jarrell Neal and his accomplices fleeing Hurst's house seconds after the murders and gives chase; Jarrell Neal fires on multiple deputies using the murder weapon. ..........................................7

     D.  Jarrell Neal's uncle, the get-away driver, testifies against him. .................10

     E.  The Evidence Central to this Appeal ........................................ 13

   II.    Relevant State and Federal Court Procedural History ............................. 15

STANDARD OF REVIEW ................................................................................ 21

SUMMARY OF THE ARGUMENT ................................................................. 21

ARGUMENT.................................................................................................... 22

   I.    It was error to disregard the state court's factual determination that Neal's trial counsel acted strategically; the state court record does not contain clear and convincing evidence which proves the contrary. .................................33

     A.  The district court failed to afford this factual determination a presumption of correctness and failed to require that Neal show clear and convincing evidence to rebut this presumption. ...........................................33

     B.  The state-court record does not contain clear and convincing evidence that trial counsel's conduct was a result of an oversight, rather than strategy. .35

II.    Even under de novo review, Neal cannot show he received ineffective assistance of counsel; thus, a fortiori, he fails to satisfy the doubly deferential "unreasonable application" exception to ADEPA's relitigation bar. .................39

   A.  Neal has not shown that his counsel performed deficiently; significant portions of the footprint report and prior statements were used and there were valid strategic reasons to have stopped there. ....................................41

   B.  Neal did not suffer prejudice; the evidence in question had little impeachment value and even if jury had believed Jarrell Neal stayed in the car, as a matter of law, he was still guilty as charged..................................45

    1.   Even if the jury had entirely disregarded Darby's testimony, and had believed Jarrell Neal never left the car, under Louisiana law, Jarell Neal was still guilty of first-degree murder...................................................................45

    2.   The district court seriously overstated the impeachment value of the three items of evidence in question and, in any event, it was dwarfed by the impeachment which was already before the jury. .........................................47

CONCLUSION.....................................................................................................51

CERTIFICATE OF SERVICE...............................................................................52

CERTIFICATE OF ELECTRONIC COMPLIANCE .........................................52

CERTIFICATE OF COMPLIANCE.....................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Austin v. Davis*,
  876 F.3d 757 (5th Cir. 2017) ............................................................... 28
*Blue v. Thaler*,
  665 F.3d 647 (5th Cir. 2011) ............................................................... 26
*Brumfield v. Cain*,
  576 U.S. 305, 135 S. Ct. 2269, 192 L. Ed. 2d 356 (2015) ......................................37
*Burger v. Kemp*,
  483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) ........................................32
*Cullen v. Pinholster*,
  563 U.S. 170, 131 S.Ct. 1388, 179 L. Ed. 2d 557 (2011) .................................. 32, 33
*Ford v. Davis*,
  910 F.3d 232 (5th Cir. 2018).................................................................. 28
*Greene v. Fisher*,
  565 U.S. 34, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011)................................................23
*Kimmelman v. Morrison*,
  477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)........................................33
*Kinsel v. Cain*,
  647 F.3d 265 (5th Cir. 2011) ............................................................... 40
*Knox v. Johnson*,
  224 F.3d 470 (5th Cir. 200).................................................................34
*Langley v. Prince*,
  926 F.3d 145 (5th Cir. 2019) ...................................................... Passim
*Miller-El v. Dretke*,
  545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) ......................................27
*Moore v. Johnson*,
  194 F.3d 586, 604 (5th Cir. 1999) ....................................................... 29
*Morales v. Thaler*,
  714 F.3d 295 (5th Cir. 2013) .........................................................28, 29
*Neal v. Louisiana*,
  535 U.S. 940 (2002) ..........................................................................16

*Neal v. Louisiana*,
  577 U.S. 1069 (2016) ........................................................................18
*O'Sullivan v. Boerckel*,
  526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ...........................23
*Padilla v. Kentucky*,
  559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)......................33
*Pippin v. Dretke*,
  434 F.3d 782 (5th Cir. 2005) .............................................................. 40
*Premo v. Moore*,
  562 U.S. 115, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011)........................32
*Reeder v. Vannoy*,
  978 F.3d 272 (5th Cir. 2018)........................................................22, 42
*Rhodes v. Vannoy*,
  751 F. App'x 524 (5th Cir. 2018) ........................................................34
*Rice v. Collins*,
  546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)..................26, 27
*Schriro v. Landrigan*,
  550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007)......................27
*Shinn v. Ramirez*,
  2022 WL 1611786 (U.S. May 23, 2022)...............................................21
*Smith v. Davis*,
  927 F.3d 313 (5th Cir. 2019) ...............................................................1
*Spence v. Johnson*,
  80 F.3d 989 (5th Cir. 1996)................................................................ 40
*State v. Neal*,
  2000-0674 (La. 6/29/01); 796 So.2d 649 ......................................16, 17
*Strickland v. Washington*,
  466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .............. Passim
*Valdez v. Cockrell*,
  274 F.3d 941 (5th Cir. 2001)............................................................... 26
*Wood v. Allen*,
  130 S. Ct. 841, 175 L. Ed. 2d 738 (2010) .............................................27

## Statutes

28 U.S.C. 2254(b) ................................................................................23
28 U.S.C. § 1291 ...................................................................................1
28 U.S.C. § 2253(c)(1) ..........................................................................1
28 U.S.C. § 2254 ..................................................................................23
28 U.S.C. § 2254(d) ..................................................................23, 37, 47
28 U.S.C. § 2254(d)(1) ................................................................. Passim
§ 2254(d) and (e)(1) .............................................................................36
§ 2254(d)(2) ....................................................................25, 26, 27, 37
§ 2254(d)(2) and (e)(1) .......................................................25, 28, 29, 41
§ 2254(e)(1) ............................................................................... Passim
§§ 2254(d)(1), (d)(2), and (e)(1) ........................................................ 28

## Rules

Fed. R. App. P. 32(a) (7) (B) ...............................................................56
Fed. R. App. P. 32(a)(5) .......................................................................56
Fed. R. App. P. 32(a)(6) .......................................................................56
Fed. R. App. P. 32(f) ............................................................................56
Fed. R. App. P. 34(a)(2) ........................................................................ 4
Federal Rule of Appellate Procedure 22(b)(3) .......................................1

## Other Authorities

*Federal Habeas Manual* §3:4 (2022) .................................................. 28
*Federal Habeas Manual* § 3:97 (2022) ...............................................36

## STATEMENT OF JURISDICTION

"The courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States …." 28 U.S.C. § 1291. While 28 U.S.C. § 2253(c)(1) generally requires a certificate of appealability for appeals of a final order in a habeas corpus proceeding, this Court has explained that, "Federal Rule of Appellate Procedure 22(b)(3) provides that a COA is not required when a state or its representatives appeals." *Smith v. Davis*, 927 F.3d 313, 319 (5th Cir. 2019).

This appeal arises from the final original Order and Judgment of the federal District Court for the Eastern District of Louisiana, together with the court's Supplemental Order, which granted Petitioner habeas relief and ordered the State to either retry or release Petitioner within 120 days of the Order. ROA.2926-2999, 3034-3048. As such, this Honorable Court has jurisdiction to hear and decide this appeal.

## ISSUES PRESENTED FOR REVIEW

The following issues are currently before the Court:

1. Whether the district court erred when it disregarded the state-court's factual finding, that Petitioner's trial counsel acted strategically or tactically, without

affording this determination a presumption of correctness or requiring Petitioner to rebut this determination with clear and convincing evidence?

2. Whether the district court erred in determining that Petitioner has satisfied the "unreasonable application" exception to AEDPA's relitigation bar?

3. Whether, even assuming Petitioner could overcome AEDPA's relitigation bar, Petitioner has nonetheless failed to prove he received ineffective assistance of counsel under de novo review?

## STATEMENT OF THE CASE

### I.    Statement of the Facts

#### A.    Murders at midnight.

In Spring of 1998, Claudette Hurst and her family lived on Wilson Street in Metairie, Louisiana. ROA.7491:12-29. They were six: Claudette, her boyfriend Fergus Robinson, her brother Carl Duncan, and her three young children—aged 12, 9, and 7. ROA.7491:22-7492:13. They had lived there for 7 to 8 months. ROA.7510:23-26.

Claudette worked during the day on March 31st, 1998; that evening, she ran an errand after work, cooked, ROA.7492:20-7493:6, and visited with her boyfriend's mother, ROA.7492:20-749432. Eventually, she fell asleep on the sofa in her den. ROA.7492:20-7493:6. It was around 11:15 P.M. ROA.7494:10-12. Her youngest

daughter lay on a couch near the home's side entrance—her two oldest, in a bedroom nearby. ROA.7494:29-7495:3, ROA.7553:21-26

Sometime before midnight, she woke to a noise. ROA.7495:19-22, ROA.7514:30-7515:1 There was commotion. ROA.7515:2-4. And she heard her boyfriend's voice; he was addressing someone, asking them to leave. ROA.7515:7-15. "Take it outside," she heard him say. ROA.7515:7-15. It was not his calm voice. ROA.7515:7-15.

The lights were off, and the only illumination in the room came from a nearby television. ROA.7496:27-31. Claudette stood up. ROA.7496:2-10. There was a wall next to her; she peered around it. ROA.7496:2–10.

> Q. … What did you see when you looked around the wall?
>
> A. I seen the-- it was like a-- I couldn't see-- it was the outline of a body, a person standing. And I seen someone like on the floor, kneeling on the floor by the sofa.

ROA.7496:11-16. The kneeling figure had a hood over their head, ROA.7496:17-20, and was near the home's entrance. ROA.7501:23-7502:3. When she looked at the standing figure: "I seen nothing but all black." ROA.7496:21-23. Later, when asked to describe what she saw, Claudette remembered the person seemed "tall," and "thin." ROA.7517:13-7518:12. She couldn't make out the face. ROA.7496:24-26. But in his hands: "I seen the barrel of a-- a long barrel of a gun." ROA.7497:5-8.

Claudette's boyfriend was standing nearby. ROA.7497:12-15. The standing figure pointed the gun at him. ROA.7497:9-11. Claudette's boyfriend glanced at her, ROA.7519:8-9, and then they both ran toward a nearby bedroom. ROA.7497:9-10, 7519:31-7520:5.

Just then, Claudette's brother opened the bedroom door from the other side. ROA.7529:11-17. He had heard the same commotion that woke Claudette—to his ear, it sounded "like scuffling, like moving furniture." ROA.7529:3–7. "[A] fight," he concluded. ROA.7529:8-10. He got up to investigate; when he opened his door, he saw Claudette and her boyfriend running towards him. ROA.7529:16-29. They raced through the open bedroom door, closed it behind them, and used their bodies to barricade it shut—there was no lock. ROA.7529:20-7530-3. "[W]hat is going on[?]" Claudette's brother asked, before helping bar the door. ROA.7529:20-30. Someone began pushing on the door from the other side, trying to get in. ROA.7530:4-6. Claudette and her family screamed. ROA.7520:19-23. "We don't have anything to do with that," Claudette's boyfriend shouted to the person on the other side of the door. "What's going on," Claudette's bother insisted again; but in the next moment: gunfire. ROA.7530:29-32. It sounded like six shots, ROA.7521:8-9—perhaps 7 or 8, ROA.7556:27-32. All the shots were in quick succession. ROA.7556:27-32. Bullet holes appeared in the bedroom door. ROA.7536:6-13. The

shots came from the other side of it; someone had been trying to push their way in; they shot through door. ROA.7521:2-7, ROA.7555:21-28. Claudette's boyfriend was hit in his leg and slumped to the floor, moaning. ROA.7521:10-12, ROA.7498:5-9, ROA.7556:5-11. Claudette's brother was hit in his arm. ROA.7530:29-32. He dove to the ground and crawled away from the door—terrified; he began to pray. ROA.7531:4-13. "Call the police," Claudette's brother shouted; "Call the police." ROA.7531:14-17. There was blood on the bedroom floor. ROA.7538:15-22. Claudette grabbed a phone and dialed 9-1-1. ROA.7498:5-14.

## B.   Witnesses hear gunshots, immediately see perpetrators fleeing Claudette Hurst's house, and are fired upon.

Larry Osborne was twenty-four years old and had been working at East Jefferson Hospital for the past five years. ROA.7560:20-27. His girlfriend was seven weeks pregnant, ROA.7574:6-9, and, that night, she called him on the telephone and asked him to bring her to the store for a late snack. ROA.7561:10-21, ROA.7562:17-20. He agreed, drove to her house, and arrived at approximately 11:30. ROA.7561:27-7562:8. She joined Larry in his car and, together, they drove the short distance to a nearby store; the trip took approximately 5 to 10 minutes. ROA.7562:14-16. They purchased some food, and then Larry drove them back to his girlfriend's house. ROA.7562:21-23. They arrived at approximately 11:45 PM. ROA.7562:29-7563:3 He parked on the street in front of his girlfriend's house and switched the lights off on his car.

ROA.7563:4-14. His girlfriend's house was on Wilson Street, ROA.7561:31-31, two houses down from Claudette Hurst, ROA.7575:13-18.

Suddenly, he and his girlfriend heard a "loud popping noise" and "right after the popping noise," he saw "two guys running down the sidewalk." ROA.7563:17-21, 7564:11-16. Both of the men were wearing ski masks and one of them was carrying "some kind of rifle in his hands." ROA.7564:11-16. He couldn't tell what kind, but "it was long." ROA.7568:31-7569:1. He couldn't tell if the other man was armed. ROA.7569:2-11. Larry realized the sound he had heard was gunfire; he shouted for his girlfriend to get down, ROA.7573:13-19 pushed her head down, and laid down on top of her, ROA.7564:11-16.

But they had already been seen, and the men opened fire open them. ROA.7564:17-19. The car began to shudder from bullet impacts and glass shattered around them. ROA.7564:17-22. Larry was terrified and thought he would die. ROA.7565:4-8. He stayed hidden until the shooting stopped, and for some time afterwards—fearing the men were still outside. ROA.7564:23-29. Thirty seconds passed; Larry sat up, looked around, and the men had gone. ROA.7564:29-32. At the same moment, his girlfriend said she felt a burning sensation in her buttocks. ROA.7565:9-14. Larry lifted her clothing, and saw a bullet hole in her pants—and her car seat filling with blood. ROA.7565:17-22. He ran to a nearby house to summon

help, ROA.7564:32-75653, then returned for his girlfriend, picked her up, and carried her to her porch to wait for an ambulance, ROA.7565:28-30.

### C. An off-duty Sheriff's deputy sees Jarrell Neal and his accomplices fleeing Hurst's house seconds after the murders and gives chase; Jarrell Neal fires on multiple deputies using the murder weapon.

Deputy Derrick McGee was an 8-year veteran of the Jefferson Parish Sheriff's Office. ROA.7593:6-19. His father lived "just around the corner," and one street over from Claudette Hurst's house. ROA.7594:2-8. Deputy McGee was off duty that night and was giving his father a ride home. ROA.7594:9-14. As they approached his fathers house, Deputy McGee noticed a black Toyota 4-Runner parked on the street. ROA.7584:22-7585:2. It caught his attention because two stolen vehicles had recently been recovered from precisely the same location, and Deputy McGee speculated that this 4-Runner may also be stolen. ROA.7594:15-25. He noticed that the 4-Runner's lights were turned off. ROA.7594:29-30. It was parked approximately 100 yards from his father's house. ROA.7594:31-7595:3.

After Deputy McGee pulled up next to his father's house and parked, as they were exiting McGee's vehicle, the deputy heard approximately 6 to 7 gunshots. ROA.7595:8-13. Quickly, McGee told his father to go inside, then went to his trunk to grab his firearm and radio. ROA.7595:8-16. Although off duty, Deputy McGee was driving his marked Sheriff's Office patrol unit. ROA.7587:26-32. Three to five

seconds later, McGee heard more rapid gunfire. ROA.7595:16-17. Then, another sound: the squeak of tires. ROA.7590:22-23. McGee got back in his vehicle and began to back out; as he did so, approximately 20 seconds after he had heard the second burst of gunfire, McGee saw the black Toyota 4-Runner which he had noticed earlier driving away at a high rate of speed. ROA.7595:16-7596:1. Instinctively, he began to pursue. ROA.7596:2-7.

As he caught up to the 4-Runner, he observed it doing approximately 25 miles per hour over the speed limit in a residential neighborhood; it blew through a stop sign. ROA.7598:5-31. McGee broadcast his observations and to other police units in the area. ROA.7600:6-21. The time was approximately 12:00 AM—midnight. ROA.7601:13-14. As the 4-Runner came to a redlight, it sped through without stopping. ROA.7602:2–10. When it did, another marked Sheriff's Office patrol unit joined the pursuit, ROA.7601:24-28, and both vehicles activated their overhead lights and sirens, ROA.7602:24-7603:5. The second unit positioned itself directly behind the 4-Runner, and Deputy McGee pulled in behind the other unit. ROA.7602:20-23.

At this point, Deputy McGee observed a subject lean out from the passenger side of the 4-Runner, with what appeared to be a semi-automatic rifle, and begin firing at the pursuing deputies. ROA.7603:15-20. The gunman fired multiple times: not

8

once or twice, but five or six times. ROA.7603:32-7601:3. Two rounds struck the other patrol unit. ROA.7610:5-9, 7652:28-7653:26. It appeared to Deputy McGee that the subject was shooting to kill. ROA.7604:7-11. McGee and the deputy driving the other unit slowed and maneuvered to evade the gunfire; McGee radioed for assistance. ROA.7604:12-28.

The same gunman leaned out of the passenger side of the 4-Runner to fire on the deputies a second time. ROA.7605:12–17. From Deputy McGee's vantage point: as he did so, he appeared to fall from the vehicle and to then trip or stumble onto the ground, ROA.7605:24-26, causing the gun to fall out of his hand ROA.7605:26-27. The deputy driving the other unit, who was directly behind the 4-Runner, recalled:

> [T]he 4-Runner started to slow down and … the subject that was hanging out the window shooting at me, attempted to jump out of the vehicle and at that time I slammed on my brakes to stop and the guy, when he jumped out of the vehicle, it looked like he fell and went face first into the concrete and the gun [went] flying out in front of him ….

ROA.7642:32-7643:9. The gunman began to flee on foot. ROA.7605:27-30. Deputy McGee and the officer from the other marked unit exited their vehicles, pursued the gunman on foot, apprehended him, and took him into custody. ROA.7606:2-6. Once in custody, both Deputy McGee, ROA.7606:32-7607:31, and the deputy driving the other patrol unit, ROA.7649:18-7650:6, positively identified the individual in custody as the gunman who had opened fire on them. The gunman's firearm was

9

secured from the ground, where it had fallen. ROA.7606:32-7607:31. The firearm was Mack 90—a weapon resembling an AK-47. ROA.7678:30-7679:1. The gunman was Jarrell Neal—Petitioner/Appellee herein. ROA.7614:17-7615:1.

Meanwhile, the 4-Runner had taken off again. ROA.7641:10-11. However, by then, a third sheriff's deputy had arrived in the area and managed to say with it as it continued to flee. ROA.7689:4-21. While the 4-Runner was still moving, the vehicle's driver (later identified as Arthur Darby, ROA.7693:3-21) opened the driver's door, bailed out of vehicle, and started fleeing on foot. ROA.7689:19-27. The 4-Runner continued forward for a time, eventually struck a tow truck, and came to a stop. ROA.7690:5-7. The pursuing deputy and his partner exited their unit—initially to chase after the driver—but soon noticed a third suspect (later identified as Zannie Neal, Jarrell Neal's brother) still located in rear of the 4-Runner, and both diverted to take him into custody. ROA.7691:21-28. Other deputies established a perimeter around the area the driver fled towards and began a search with the assistance of K-9 units. ROA.7691:31-7692:15. Approximately 10 to 15 minutes later, the 4-Runner's driver was located, positively identified, and taken into custody. ROA.7692:16-29.

### D.     Jarrell Neal's uncle, the get-away driver, testifies against him.

Following his arrest, the 4-Runner's driver—Arthur Darby—was indicted for first degree murder along with the Neal brothers, Jarrell and Zannie. ROA.7789:22-

27. He later reached a plea agreement with the State; pursuant to that agreement, Darby pleaded guilty to manslaughter, was sentenced to 20 years incarceration, and testified against Jarell Neal during Neal's trial. ROA.7789:31-7790:18.

He testified that Jarrell and Zannie Neal were his nephews. ROA.7790:19-24. The night of the homicides, the brothers came to his house at approximately 9:30, 10:00 PM. ROA.7791:9-13. According to Darby, Jarrell and Zannie made a living selling drugs; that evening, while at his house, Zannie explained to Darby that someone owed him money for drugs, that he needed to collect, and asked for Darby's help as a driver. ROA.7791:9-7792:11. Darby agreed, changed clothes, and three of them all got into Zannie's black 4-Runner. ROA.7794:12-26. Before leaving, Zannie asked Darby if he had his .38 pistol; when Darby said he didn't, Zannie told him he might need it; Darby retrieved his firearm and got back in the car with the Neal brothers. ROA.7795:2-15. Zannie was driving, Darby was in the front passenger seat, and Jarrell was in the back seat. ROA.7795:16-21. They drove to an area near Claudette Hurst's house and parked—avoiding police on the way. ROA.7795:28-7796:13. Zannie told Darby to get in the driver's seat of the 4-Runner and to sit tight. ROA.7796:17-21. Darby did as instructed. ROA.7796:20-21. The 4-Runner's engine was still running; its lights were off. ROA.7796:22-25. Jarrell and Zannie exited the car and, when Jarrell left, he had a "rifle" in his hands—an "A.K.," he said, with a

11

"[b]rown handle." 7796:26-7797:6. Darby did not see anything in Zannie's hands. ROA.7797:15-16. The brothers left—to where, Darby did not know. ROA.7797:17-20. Darby remembered a marked police car passed by while they were gone. ROA.7797:21-27.

Three to four minutes passed; suddenly, Darby heard gunshots. ROA.7797:28-7798:1. The shots sounded nearby; he saw Jarrell and Zannie running back to the car; Jarrell was wearing what looked like a knit hat; he had the same rifle in his hands; Zannie was carrying a pistol. ROA.7798:2-23. The brothers got back in the 4-Runner and Jarrell told him to pull off fast. ROA.7798:29-7799:3. Zannie cautioned him not to draw any suspicion. ROA.7799:1-3. Darby was driving; Jarrell was in the front passenger seat; Zannie was in the back. ROA.7800:4-10.

According to Darby, Jarrell said: "the n[#####] was down bad for trying to play him, but now he crying like a little b[####]." ROA.7799:4-6. Zannie told Darby his gun had jammed; he further explained that a "guy came at him" so he "hit him over the head" and, in doing so, "the gun went off and the bullet went in the floor." ROA.7799:7-12.

They noticed the police behind them, and Darby sped up. ROA.7799:13-23. He ran a redlight; another police vehicle started pursuing them; they had their lights on. ROA.7800:14-26. Darby confirmed that Jarrell fired on the officers chasing them

by hanging out the 4-Runner's window with his rifle. ROA.7801:6-18. According to Darby, a police vehicle pulled in front of the 4-Runner, forcing him to swerve to avoid it; when he did, "Jarrell fell out the window." ROA.7801:25-7802:2. His gun went with him. ROA.7802:3-5.

Darby kept driving, at first, then slowed down, bailed out of the car, ran, and hid. ROA.7802:14-27. But the police K-9 units found and apprehended him; he was bitten by the dogs while being taken into custody, had to be taken to Charity Hospital for emergency treatment, ROA.7802:28-7803:5, and had wounds on his right thigh, back, and arm, ROA.7813:23-28.

### E.    The Evidence Central to this Appeal

Three items of evidence, in particular, are central to this appeal:

First, during their scene investigation inside Claudette Hurst's home, detectives with the Jefferson Parish Sheriff's Office located a bloody footprint on a piece of tile on the floor of Ms. Hurst's living room. Detectives documented that footprint and compared it to the three pairs of shoes collected from the defendants in this case: Jarrell Neal, Zannie Neal, and Arthur Darby. The results of that comparison were outlined in a "Scientific Analysis Report" authored by a forensic scientist employed by the Jefferson Parish Sheriff's Office. ROA.368. According to that report, "[t]he shoe sole patterns on the shoes" attributed to Arthur Darby and Jarrell Neal "are

13

not like the pattern of the partial print on" the floor tile collected from Claudette

Hurst's house." ROA.368. "The shoe sole pattern of the shoes" attributed to Zan-

nie Neal, "cannot be excluded as the possible origin of the partial print" on the floor

tile from Claudette Hurst's house. ROA.368 However, "[t]he insufficient amount

of detail of the print precluded any conclusive comparison." ROA.368.

Second, the Jefferson Parish Sherriff's Office also conducted serology testing

on the three pairs of shoes collected from the defendants in this case. The results of

this analysis were documented in a separate "Scientific Analysis Report."

ROA.1506-1507. According to that report, analysis of the shoes attributed to Jarrell

Neal and Arthur Darby showed the following: "Preliminary analysis indicated the

possible presence of blood; however, due to limited sample size, no further analysis

was performed." ROA.1506-1507.

Third, in February of 1999, a detective with the Jefferson Parish Sherriff's Of-

fice conducted a taped interview with Arthur Darby. ROA.411-420. The transcript

of that interview contains the following pertinent exchanges:

> [Detective]: Did you notice any weapons when they
> first got out?
>
> Darby: No
>
> …

| [Detective]: | What kind of gun did Jarrell have in his hand when he got out? |
| Darby: | I didn't see when he got out. |
| … | |
| [Detective]: | Now, when they came back, who got in what part of the car? |
| Darby: | They both got in the back. |
| [Detective]: | They both go in the back? You were driving? |
| Darby: | Correct |

ROA.411-420.

## II.   Relevant State and Federal Court Procedural History

Following their arrests, Jarrell Neal, his brother Zannie, and their uncle Arthur Darby were jointly indicted for first-degree murder. ROA.3996. Following trial, Jarrell Neal was convicted as charged and sentenced to death.

He appealed directly to the Louisiana Supreme Court. That court affirmed both his conviction and sentence. *State v. Neal*, 2000-0674 (La. 6/29/01); 796 So.2d 649; ROA.12979-12996. In addition to its published principal opinion on appeal, the Court issued an unpublished appendix opinion which addressed, and found no merit in, additional claims raised by Neal. ROA.12997-13063.

15

Neal filed a petition for writ of certiorari before the United States Supreme Court, which was denied, *Neal v. Louisiana*, 535 U.S. 940 (2002); as was his associated request for rehearing, *Neal v. Louisiana*, 535 U.S. 1075 (2002).

He then sought post-conviction relief in Louisiana district court alleging numerous grounds. ROA.15075-15409. As relevant to this appeal, Neal claimed the State had suppressed the three items of evidence discussed above: the serology report, the footprint comparison report, and the February 1999 interview with Arthur Darby. ROA.15099. In the alternative, Neal claimed that, if the State had not suppressed this evidence, his attorney was ineffective in failing to use this evidence at trial. ROA.15136. The Louisiana post-conviction court found that the State had not suppressed this evidence. ROA.17079-17080. The court further found that the manner and extent to which Neal's trial counsel had used these three items of evidence was the result of a strategic decision, that these decisions were not constitutionally deficient, and that, in any event, even had his counsel made greater use of this evidence during trial, there was no reasonable probability that the outcome of the trial would have been different. ROA.17081. It therefore denied both claims. ROA.17079-17086.

Neal sought writs directly from the Louisiana Supreme Court, but that application was denied without reasons. *State v. Neal*, 14-0259 (La. 4/17/2015); 168 So.3d

391. Neal filed a petition for writ of certiorari before the United States Supreme Court, which was also denied. *Neal v. Louisiana*, 577 U.S. 1069 (2016).

 Neal then filed an application for writ of habeas corpus in the United States District Court for the Eastern District of Louisiana. ROA.35-284. Among other grounds for relief, Neal re-urged his claim that the State had suppressed the three items of evidence, and that, again in the alternative, if it did not suppress this evidence, Neal's trial counsel was ineffective in failing to use this evidence. ROA.35-284.

During the pendency of these claims for relief, the district court granted Neal leave to conduct DNA testing on evidence related to one of the allegedly suppressed items of evidence: the serology report. ROA.1315. Following the completion of that testing, Neal sought and was granted permission to file an amended application adding a new, unexhausted claim of ineffective assistance. ROA.1315-1329. That claim alleged Neal's trial counsel was ineffective in failing to conduct DNA testing or introduce the results of that testing at trial. ROA.1315-1329. He further claimed that his post-conviction relief counsel was ineffective in failing to request DNA testing during state post-conviction proceedings. ROA.1315-1329. In response, the State conducted its own DNA testing on related evidence. ROA.2164-2193. Neal sought partial summary judgment on his claim for relief concerning suppression of evidence,

his original exhausted ineffective assistance of counsel claims for failing to use the allegedly suppressed evidence, as well as his new (unexhausted) claim related to failure to conduct DNA testing. ROA.2099-2133. Both Neal and the State presented the results of their DNA analysis in their motions related to summary judgment. ROA.2099-2133, ROA.2143-2193. In summary, Neal contended his DNA analysis showed that blood belonging to one of the murdered victims was found on a pair of shoes which belonged to Arthur Darby, thereby calling his testimony into question. ROA.2099-2133. The State argued that its more extensive DNA analysis indicated that the shoes which tested positive for the victim's blood, in fact, had been worn by Neal— thereby further evidencing his guilt. ROA.2143-2193.

The district court denied summary judgment. ROA.2275-2336. However, it ordered an evidentiary hearing on the issue of whether the State had suppressed the three items of evidence as alleged by Neal. 2275-2336. That hearing was held, and the Court took the matter under advisement. ROA.3150-3325. Of note, the district court elected to handle all these issues directly and did not refer any component of Neal's habeas petition to a magistrate judge for preliminary investigation or for a report and recommendations.

In due course, the district court entered judgement denying Neal's claim related to the alleged suppression of evidence but granted relief as to Neal's exhausted

ineffective assistance of counsel claim (alleging failure to use the allegedly suppressed evidence) as well as his unexhausted ineffective assistance of counsel claim related to the failure to obtain DNA analysis. ROA.2926-2999. In summary, like the state post-conviction court, the district court concluded that Neal had failed to show that the State suppressed the serology report, the footprint report, or Darby's prior statement. ROA.2926-2999. With respect to Neal unexhausted claim related to DNA testing, the district court granted relief, finding that both Neal's trial and post-conviction counsel had been ineffective in failing to obtain DNA analysis. ROA.2926-2999. Finally, with respect to Neal's exhausted, ineffective assistance of counsel claim: the district court determined that Neal's trial counsel had failed to introduce the details of the serology report, the footprint report, and Darby's prior statement as a result of oversight, not strategy. ROA.2926-2999. It concluded that the state post-conviction court's determination to the contrary was unreasonable. ROA.2926-2999. It concluded that Neal's trial counsel had rendered deficient performance by failing to better use the three pieces of evidence during trial and, finally, that Neal had suffered prejudice as a result of this deficiency. ROA.2926-2999. The district court granted habeas relief and ordered the State to retry or release Neal within 120 days of its judgment.

However, three days later, the United States Supreme Court decided *Shinn v. Ramirez*, No. 20-1009, 2022 WL 1611786 (U.S. May 23, 2022). The district court ordered supplemental briefing concerning the impact of this decision on Neal's unexhausted ineffective assistance of counsel claim concerning failure to conduct DNA analysis. ROA.3005. Both parties briefed this issue. ROA.3006-3015, ROA.3016-3033.

The district court entered a supplemental order and reasons recognizing that *Shinn v. Ramirez* invalidated its grant of habeas relief as to Neal's unexhausted ineffective assistance of counsel claim relating to DNA analysis. ROA.3034-3048. However, it confirmed its grant of relief as to Neal's exhausted ineffective assistance of counsel claim concerning trial counsel's failure to use the allegedly suppressed items of evidence: the serology report, the footprint report, and Darby's prior statement. Once again, it ordered the State to either retry or release Neal within 120 days of its original order granting relief. ROA.3034-3048.

The State timely gave notice of its appeal. ROA.3051. Simultaneously, the State sought a stay of the district court's judgment granting relief. ROA.3052-3054. Neal opposed this motion. ROA.3075-3092. The district court, ultimately, granted the State's motion for stay. ROA.3134-3149.

This matter is now before this Court on the State's appeal of the district court's grant of relief as to Neal's ineffective assistance of counsel claim concerning trial counsel's failure to use the allegedly suppressed items of evidence: *i.e.*, the serology report, the footprint report, and Darby's prior statement.

## STANDARD OF REVIEW

This Court has set forth the generally applicable standard of review as follows: "In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court's decision as did the district court." *Reeder v. Vannoy*, 978 F.3d 272, 276 (5th Cir. 2018).

## SUMMARY OF THE ARGUMENT

First, the district court erred by disregarding the state post-conviction court's factual determination that Neal's trial counsel acted strategically because the state-court record did not contain clear and convincing evidence sufficient to overcome the statutory presumption of correctness under AEDPA.

Second, even under de novo review, Neal cannot show he received ineffective assistance of counsel; thus a fortiori, he fails the doubly deferential "unreasonable application" exception to AEDPA's relitigation bar.

## ARGUMENT

Review in this case is governed by 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). As relevant here, AEDPA prohibits a prisoner from raising any claim in federal court unless it was first exhausted in state court. *See* 28 U.S.C. 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 839–40, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). After the state court adjudicates the claim, the prisoner must overcome "the relitigation bar imposed by AEDPA." *Greene v. Fisher*, 565 U.S. 34, 39, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011) (citing 28 U.S.C. § 2254(d)(1)). To overcome AEDPA's relitigation bar, a state prisoner's claim must satisfy one of its narrow exceptions. These exceptions are listed in 28 U.S.C. § 2254(d), which states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Prisoners attempting to satisfy one of these exceptions must also contend with the mandatory presumption of correctness set out in § 2254(e)(1); it provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Under AEDPA, the nature of a state prisoner's claim determines which of these provisions governs; claims are organized into thee different categories: (1) those presenting questions of law, (2) those presenting questions of fact, and (3) those presenting mixed questions of law and fact.

Claims presenting questions of law are reviewed under § 2254(d)(1). This exception to AEDPA's relitigation bar is further divided into two categories: the "contrary to" prong, and the "unreasonable application" prong. A state prisoner can only satisfy the "contrary to" prong if he can show the state-court decision "arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially

23

indistinguishable facts." *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc) (internal citations omitted). The "unreasonable application" prong, this Court has said, "is almost equally unforgiving." *Id.* To satisfy it, "it is not enough to show the state court was wrong." *Id.* at 156. "Rather, the relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (emphasis original and internal citations omitted). Said differently, the "unreasonable application" prong "asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court." *Id.* (internal citations omitted).

Claims presenting questions of fact are reviewed under § 2254(d)(2) and (e)(1). This Court has said that § 2254(e)(1) applies to the review of individual facts from the extant state court record, and § 2254(d)(2) applies to the review of the entire factual basis on which the state court decision rested. This approach requires a federal court reviewing a case to accord § 2254(e)(1)'s rebuttable presumption of correctness to each disputed factual determination. Then, in reviewing the state court's decision, the court considers the entire factual basis and utilizes the reasonableness standard from § 2254(d)(2) to access, ultimately, whether the second

exception to AEDPA's relitigation bar has been satisfied. This Court has explained

it this way:

> Whereas § 2254(d)(2) sets out a general standard by which the district court evaluates a state court's specific findings of fact, § 2254(e)(1) states what an applicant will have to show for the district court to reject a state court's determination of factual issues. For example, a district court may find by clear and convincing evidence that the state court erred with respect to a particular finding of fact, thus rebutting the presumption of correctness with respect to that fact. *See* § 2254(e)(1). It is then a separate question whether the state court's *determination* of facts was unreasonable in light of the evidence presented in the state court proceeding. *See* § 2254(d)(2). Thus, it is possible that, while the state court erred with respect to one factual finding under § 2254(e)(1), the determination of facts resulting in its decision in the case was reasonable under § 2254(d)(2).

*Valdez v. Cockrell*, 274 F.3d 941, 951 n.17 (5th Cir. 2001); s*ee also Blue v. Thaler*, 665

F.3d 647, 654 (5th Cir. 2011) ("The clear-and-convincing evidence standard of §

2254(e)(1)—which is 'arguably more deferential' to the state court than is the un-

reasonable-determination standard of § 2254(d)(2)—pertains only to a state court's

determinations of particular factual issues, while § 2254(d)(2) pertains to the state

court's decision as a whole.") (footnote omitted). The deference to state-court fact-

finding required by these provisions precludes a federal court from setting "aside

reasonable state-court determinations of fact in favor of its own debatable interpre-

tation of the record…." *Rice v. Collins*, 546 U.S. 333, 335, 126 S. Ct. 969, 163 L. Ed.

2d 824 (2006). The fact that reasonable minds reviewing the record might disagree about the factual finding also does not suffice to supercede the trial court's factual finding. *Id.* at 335. Nor is it enough to show that a state court's decision was incorrect or erroneous; a petitioner must show that the decision was objectively unreasonable, "a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). Finally, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010); *see also Rice v. Collins*, 546 U.S. 333, 342, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stressing that AEDPA forbids a federal court from using "a set of debatable inferences" to set aside a state court's factual determination). Ultimately, to clear the required threshold, the petitioner must show that "a reasonable factfinder *must* conclude" that the state court's determination of the facts was unreasonable. *Collins*, 546 U.S. at 341 (emphasis added); *see also Miller-El v. Dretke*, 545 U.S. 231, 275, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (Thomas, J., dissenting) (explaining that a petitioner is not entitled to relief under § 2254(d)(2) unless he can "show that, based on the evidence before the [] state courts, the only reasonable conclusion was that" a constitutional violation occurred).

Claims presenting mixed questions of law and fact—as the name suggests—are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under § 2254(d)(1); however, the underlying factual findings supporting that conclusion receive the deferential protections afforded factual findings under § 2254(d)(2) and (e)(1). *See Austin v. Davis*, 876 F.3d 757, 782–84 (5th Cir. 2017) (§2254(e)(1)'s presumption of correctness accorded to state court's findings of fact underlying determination of voluntariness of petitioner's waiver of counsel, a mixed question of law and fact); *accord* Brian R. Means, *Federal Habeas Manual* §3:4 (2022) ("Challenges to mixed questions of law received mixed review. The state court's ultimate conclusion is reviewed under § 2254(d)(1) … but its underlying factual findings supporting that conclusion are clothed with all the deferential protection afforded factual findings under § 2254(d)(2) and (e)(1)."). This applies "not only to express findings of fact, but to the implicit findings of the state court" as well. *Ford v. Davis*, 910 F.3d 232, 234–35 (5th Cir. 2018). In particular, claims of ineffective assistance of counsel under *Strickland v. Washington* present mixed questions of law and fact and, like other such claims, are reviewed using a combination of §§ 2254(d)(1), (d)(2), and (e)(1). *Morales v. Thaler*, 714 F.3d 295, 301–306 (5th Cir. 2013). As relevant here, a state-court determination that trial counsel's conduct at trial was the result of a strategic and tactical decision is a question of fact, *Moore v.*

*Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) and is analyzed under §§2254(d)(2) and (e)(1). *Morales*, 714 F.3d at 301–06. Whether trial counsel's conduct (strategic or not) constituted ineffective assistance of counsel is a separate, legal question and is analyzed under §2254(d)(1)'s "contrary to" and "unreasonable application" prongs. *Morales*, 714 F.3d 301–06. Of significance, because of this "unforgiving" structure, *Langley*, 926 F.3d at 155, ineffective assistance of counsel claims under *Strickland v. Washington* "are particularly difficult to win under AEDPA's relitigation bar." *Morales*, 714 F.3d at 302. An often-quoted passage from *Harrington v. Richter* explains why:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

562 U.S. 86, 105; 131 S.Ct. 770, 788; 178 L.Ed.2d 624 (2011) (internal citations omitted). "If this standard is difficult to meet," the Court continued, "that is because it was meant to be." *Id.* at 102.

And even if a petitioner can traverse this thicket of obstacles, more remain. *See Langley*, 926 F.3d at 156 ("Overcoming AEDPA's relitigation bar is necessary but not sufficient to win habeas relief."). "Even after overcoming the bar, the prisoner must still show, on de novo review, that he is in custody in violation of the constitution or laws or treaties of the United States." *Id.* (internal citations omitted).

The appeal before this Court concerns federal habeas review of the state court determination that Jarrell Neal failed to carry his burden of proving either deficient performance or resulting prejudice under the framework established in *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Accordingly, even if Neal were able to satisfy ADEPA's "unforgiving" exceptions to the relitigation bar, he must then, on de novo review, still satisfy *Strickland's* exacting requirements.

Under this standard, to prevail on an ineffective assistance of counsel claim, a petitioner has the burden of showing (1) deficient performance, that is, that his trial counsel's performance "fell below an objective standard of reasonableness;" and (2) resulting prejudice, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just re-sult." *Id.* at 686. Effective representation does not require perfection; the constitu-tion merely guarantees that level of representation necessary to "ensure that crimi-nal defendants receive a fair trial." *Id*. at 689.

To satisfy the first prong and prove that counsel's performance was deficient, the prisoner must show that "counsel made errors so serious that he was not func-tioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. A court's "scrutiny of counsel's performance is highly deferential." *Id.* at 689. The Supreme Court has cautioned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id*. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspec-tive at the time." *Id*.; 466 U.S. at 690.

The deficiency test is an objective one. The question is whether counsel's rep-resentation "fell below an objective standard of reasonableness." *Id.* at 688. An at-torney's actions are deficient only if "no competent attorney" would have taken the

action counsel did. *Premo v. Moore*, 562 U.S. 115, 131 S. Ct. 733, 741, 178 L. Ed. 2d 649 (2011) (noting that the "relevant question under *Strickland*" is that "no competent attorney" would have taken counsel's action). In making this inquiry, a reviewing court is "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons … counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196, 131 S.Ct. 1388, 179 L. Ed. 2d 557 (2011). The issue is not what is possible, or even "what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987).

Strategic choices by counsel "are virtually unchallengeable." *Strickland*, 466 U.S. at 668. Indeed, "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Pinholster*, 563 U.S. at 196 (quoting *Strickland*, 466 U.S. 689–90). To rebut this presumption, a prisoner must prove "that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) (citations omitted). And, as the Supreme Court has repeatedly stressed, "[s]urmounting *Strickland's* high bar is never

31

an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

To satisfy the second prong of *Strickland*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

In this regard, "[a] court hearing an ineffectiveness claim must weigh the evidence produced at trial that is unaffected by the alleged error, along with the evidence that was affected by the error and the degree to which it was affected, and must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 695–96. As this Court has noted, "[e]ven a deficient performance does not result in prejudice unless that

conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result." *Knox v. Johnson*, 224 F.3d 470, 479 (5th Cir. 200). Again, it is the petitioner's burden to establish prejudice. *Rhodes v. Vannoy*, 751 F. App'x 524, 527 (5th Cir. 2018).

**I.     It was error to disregard the state court's factual determination that Neal's trial counsel acted strategically; the state court record does not contain clear and convincing evidence which proves the contrary.**

**A.     The district court failed to afford this factual determination a presumption of correctness and failed to require that Neal show clear and convincing evidence to rebut this presumption.**

The state district court concluded that the defendant's trial counsel did not elicit additional details from the serology report, the footprint report, and the February 1999 interview with Arthur Darby for strategic reasons. Under this Court's cases, this question is a pure question of historical fact. As such, under AEDPA, the State district court's conclusion on this point was entitled to a presumption of correctness and could only be overturned by clear and convincing evidence to the contrary. Yet, the district court rejected the state court's factual determination on this point and concluded that additional details were not elicited as a result of oversight, not strategy. In doing so, the district court ignored § 2254(e)(1). The federal district court substituted its opinion of the evidence for the state district court's without applying this controlling statutory provision. This was clear legal error.

33

It was suggested below that the State had waived this issue. Following the Court's supplemental order granting habeas relief, the State sought a stay of the district court's judgment pending appeal, in part, based on the district court's failure to properly apply 28 USC § 2254(e)(1). ROA.3063-3064. Neal claimed this issue had never been raised before, and was thus waived. ROA.3078-3079. The district court agreed. ROA.3146. The record proves otherwise.

The State repeatedly quoted the language of 28 USC § 2254(e)(1), verbatim, in its various replies to Neal's filings during these habeas proceedings: it did so in its initial response in opposition to Neal's application for writ of habeas corpus, ROA.802; it also did so in its memorandum in opposition to his motion for evidentiary hearing, ROA.1207. Moreover, the State explicitly noted the difference in standards of review between pure questions of fact and mixed questions of law and fact in its opposition to Neal's motion for partial summary judgment. ROA.2144-2145. As, in fact, did the trial court; in its order and reasons denying Neal's motion for partial summary judgment, the court cited 28 USC § 2254(e)(1) and observed, correctly, that "a determination of a factual issue made by a State court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence." ROA.2296-2297. The same observation appears, verbatim, in the court's original order and reasons granting habeas relief. ROA.2951. So,

here, the district court had the correct standard of review before it; the state repeatedly referred to it, and the court repeatedly restated it. The district court simply failed to follow it—a deficiency not chargeable to the State. This issue was properly preserved.

In any event, "[i]t is generally understood that the deferential review standards under § 2254(d) and (e)(1) may not be waived by the government." Brian R. Means, *Federal Habeas Manual* § 3:97 (2022); *see Langley v. Prince*, 926 F.3d 145, 162 (5th Cir. 2019) (en banc) ("Every court of appeals to consider the question—including ours—has held a State's lawyers cannot waive or forfeit § 2254(d)'s standard."); *but see Brumfield v. Cain*, 576 U.S. 305, 323, 135 S. Ct. 2269, 192 L. Ed. 2d 356 (2015) (issue of review under "arguably more deferential standard set out in § 2254(e)(1)" rather than under §2254(d)(2)'s "unreasonable determination of the facts" standard "deemed waived" at Supreme Court where not addressed below or by State in its brief in opposition to certiorari).

### B. The state-court record does not contain clear and convincing evidence that trial counsel's conduct was a result of an oversight, rather than strategy.

In disregarding the the post-conviction court's factual finding, the district court relied on an affidavit executed by Neal's trial counsel during state post-conviction proceedings. In it, Neal's trial counsel stated: "I did not review the physical or

forensic evidence in the case…." ROA.351. He also stated, "I also believe that, if I had received these reports, I would have used them at trial to undermine the prosecution's case against Jarrell." ROA.352. In both its original and supplemental order, the district court claimed that, in making these statements, Neal's trial counsel "admitted that there was no strategy behind his decision not to use the reports to impeach Arthur Darby." ROA.2982, 3044. But the district court's interpretation of trial counsel's affidavit is debatable and, under AEDPA, the mere existence of multiple reasonable interpretations forecloses the district court's analysis.

First, trial counsel's reference to "forensic evidence" is ambiguous. The district court, in effect, interprets this phrase to refer to the footprint and serology reports at issue. But that is hardly the only reasonable interpretation. The phrase could be a reference to tangible forensic evidence, such shell casings, or the floor tile with the bloody footprint. Indeed, trial counsel's use of the word "physical" along with "forensic" to modify "evidence" invites this interpretation. Under AEDPA, so long as there were any reasonable interpretations of this phrase which did not include the footprint or the serology report, the district court was required to defer to the state court's factual finding. Here, there were.

Second, trial counsel's claim, that he did not review the forensic evidence—if it means what the federal district court below claims it does—contradicts the next

claim that court points to: the claim that "I also believe that, if I had received these reports, I would have used them at trial to undermine the prosecution's case against Jarrell." ROA.351 One cannot (with any credibility) claim on the one hand to have utterly ignored every one of the forensic reports in this case and, on the other, claim that they would have used (hence, read) the reports in question here. One claim is simply incompatible with the other, and the district court's effort to fuse the two simply defies logic.

Third, even if the district court's interpretation of trial counsel's ambiguous affidavit was not internally inconsistent, there was also ample reason from the state-court record to doubt the reliability of trial counsel's recollection. At the time trial counsel signed his affidavit, he was attempting to reconstruct an event which had happened over a decade before. ROA.351 ("It has been some 12 years since I handled the case…."). And he had destroyed his own contemporaneous records of Jarrell Neal's trial. ROA.351 ("I disposed of Mr. Neal's file after my representation."). He also misstated the conclusions of the reports he claims he would have used. ROA.352 ("The reports indicate that blood was found on Arthur Darby's shoes…."). It also appears that he had not reviewed all the relevant materials from the trial court record. *See* ROA.352 (trial counsel only references having reviewed the "forensic reports" listed in his affidavit, not police reports, transcripts, etc.). Trial counsel also

37

referred to the reports in question as "exculpatory," a characterization even the district court was not prepared to endorse, ROA.2985 ("The Court acknowledges that the evidence is not *per se* 'exculpatory.'". Here, even if the district court's interpretation of the affidavit was the only reasonable one—but it was not—the state post-conviction court had able reasonable grounds to doubt the accuracy of trial counsel's recollection. In this regard, the district court's failure to afford the state court's factual determination a presumption of correctness is all the more egregious because, in essence, the state court was evaluating the credibility of trial counsel's affidavit in light of the contradictory evidence in the record—and credibility determinations of this sort are entitled to heightened deference even outside ADEPA's already highly deferential context. As this Court has said, "[a] trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." *Kinsel v. Cain*, 647 F.3d 265, 270 n.17 (5th Cir. 2011) quoting *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005).

Fourth, and in a more general sense, the district court's full-throated embrace of trial counsel's affidavit endorses (despite the state courts' contrary approach) precisely the kind of after-the-fact, second-guessing that the United States Supreme Court has cautioned should rarely be credited. Like recanting witnesses, *Spence v.*

38

*Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) ("[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts."), after-the-fact affidavits from trial attorneys should be guarded against, not amplified via exegesis, *see Richter*, 131 S.Ct. at 790 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.").

## II.    Even under de novo review, Neal cannot show he received ineffective assistance of counsel; thus, a fortiori, he fails to satisfy the doubly deferential "unreasonable application" exception to ADEPA's relitigation bar.

At the outset, it is important to identify which exception to AEDPA's relitigation bar the district concluded Neal had satisfied in this case. Here, the answer is perfectly clear: the district court analyzed Louisiana's resolution of Neal's ineffective assistance of counsel claim exclusively in terms of 28 USC § 2254(d)(1); although it mentioned §§2254(d)(2) and (e)(1) in its generally applicable discussion of ADEPA's requirements, its actual analysis of the state courts' determination of Neal's claims makes its grant of relief based on § 2254(d)(1) crystal clear. For example, in its original order and reasons granting relief, the court reasoned it must defer to the conclusion that trial counsel's "decisions were sound trial strategies ... unless it was contrary to or an unreasonable application of clearly established federal law."

ROA.2976. It further noted that "[w]here, as here, a state court correctly identifies the governing clearly established law, a state court decision may nevertheless be 'an unreasonable application' of that law if it 'applies [the law] unreasonably to the facts of a particular prisoner's case.' " ROA.2976. Its supplemental order and reasons is even more clear; there, the court characterized its original holding as follows: "As explained in detail in the May 22, 2022 Order and Reasons the state court's denial of relief on the exhausted ineffective assistance of counsel claim was contrary to, or an unreasonable application of, clearly established federal law." ROA.3042. The language from both its original and supplemental order and reasons is taken directly from 28 USC § 2254(d)(1)—which precludes habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim … resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law ….". This matters because, "[i]n a habeas corpus appeal," this court "review[s] the district court's findings of fact for clear error and its conclusions of law de novo, *applying the same standards to the state court's decision as did the district court.*" *Reeder v. Vannoy*, 978 F.3d 272, 276 (5th Cir. 2018) (emphasis added).

40

### A. Neal has not shown that his counsel performed deficiently; significant portions of the footprint report and prior statements were used and there were valid strategic reasons to have stopped there.

Neal's trial counsel used elements of both the footprint report and Darby's February 1999 statement. The only part of the footprint report which was not put before the jury was a detail which would not have been helpful to Jarrell Neal's case. Introduction of any of the details of the serology report would have exposed Neal to other details which would have fundamentally undermined his trial strategy. And Neal's trial counsel used one of the two possible inconsistent statements from Darby's February 1999 statement. Trial counsel's treatment of these three pieces of evidence had the effect of putting the most useful aspects of all this evidence in front of the jury while avoiding those aspects which were potentially damaging. If this outcome was the result of mere oversight, it was not just one; it was a string of remarkably fortuitous oversights—a pattern which bears the hallmark of strategy, not negligence. *See Richter*, 131 S.Ct. at 790 (quoting *Yarborough*, 540 U.S. at 8) ("There is a strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'").

Although the "possible presence" of blood on shoes which were attributed to Arthur Darby was not put to the jury, as the federal district court noted in its order and reasons grating habeas relief, there was an innocent explanation for this blood.

41

ROA.2981. ("Considering that blood *could* have come from the police apprehension, it could have been a trial strategy not to ask about the presence of blood on Arthur Darby's shoe.") As the court correctly observed, during his apprehension, Darby was bitten in multiple locations on his body by K-9 units with the Jefferson Parish Sheriff's Office. These injuries included injuries to his legs. ROA.7813:23-26. And these injuries required that Darby receive treatment at a hospital following his arrest. ROA.7813:27-28. In fact, Neal's own retained expert during post-conviction relief noted that there was blood on the clothing attributed by the chain-of-custody report to Darby. (PG 67 of 250) Hence, even if the "possible presence of blood" had been confirmed by a defense expert to, in fact, be blood, even the actual presence of actual blood on Darby's shoe would not have been particularly surprising. Darby, himself, had been bleeding that night.

And introducing this easily explained away fact would have occasioned significant risk. As the federal district court also noted, any argument Jarrell Neal's trial counsel made suggesting that the presence of blood on Darby's shoe proved Darby's guilt, would have had to contend with fact that the same report also noted the possible presence of blood on shoes attributed to Jarrell Neal. ROA.2981 ("Additionally, the serology report indicated the possible presence of blood on [Jarrell Neal]'s shoes. It is conceivable that counsel may not have wanted to question Darby about the

report because it also showed the presence of blood on [Jarrell Neal]'s shoe."). Hence, the results of the serology report—particularly if it had been confirmed by additional expert analysis and testimony—was, at best, a double-edged sword; its marginally useful impeachment content depended on an argument which would have fundamentally undercut Neal's claim to have remained in the car at the time of these crimes.

Turing to the footprint report: the testimony at trial was that the report did not match any of the three defendants' shoes. On direct-examination, the detective investigating the scene inside of Claudette Hurst's home testified that "we picked up a tile on the floor that had a bloody footprint on it." ROA.7727:28-32. He also identified a photograph of the bloody shoeprint and pointed out to the jury where the shoeprint was located on the crime scene sketch. ROA.7730:25-7731:6. On cross-examination of this detective, Neal's trial counsel elicited the results of the forensic show print comparison, and the detective's testimony regarding that analysis was precisely correct; he explained that "I think they determined it's blood on the tile, but as far as being able to match it to something, I don't think they were able to match it to an actual shoe ... [t]hat's -- when I say negative, that's what I mean." ROA.7737:18-7738:4. This was absolutely accurate; the report did not conclusively match any of the defendants' shoes. Defense counsel cross-examined this detective

about the shoe print on multiple occasions in fact, and that cross-examination consumes multiple pages of the trial transcript. ROA.7740:29-7743:13. Hence, the testimony at trial was correct. The only detail of the report that was not explicitly put before the jury was the fact that Zannie Neal's shoes could neither be matched nor excluded as the shoes which made the footprint. But this fact could only corroborate Arthur Darby's testimony; it does not contradict it. Hence, the principal effect that explicitly detailing this fact would have made would have been to further confirm Arthur Darby's testimony.

As for Darby's prior statement, it contained two inconsistencies. Neal's trial counsel introduced one of them. And, although he did not introduce the other, the second statement was, itself, inconsistent with the first statement Darby had made to the police shortly after his arrest. Hence, of the two, the inconsistent statement Neal's counsel did introduce was, by any objective measure, the stronger of the two. And this kind of selection between alternatives is precisely the type of nuanced, in-the-moment choice the Supreme Court's cases teach courts must be loath to second-guess.

Far from showing deficiency, the state-court record in this case amply demonstrates that Jarrell Neal's trial counsel handled each of these items with care. Hence, even on de novo review, Neal comes nowhere close to overcoming the "strong

44

presumption that counsel's representation was within the 'wide range' of reasonable professional assistance" which governs his *Strickland* claim. *Richter*, 131 S.Ct. at 787. This alone is sufficient to foreclose relief. And when this "strong presumption" is viewed through the highly deferential lens of § 2254(d)," *Mirzayance*, 556 U.S. at 121 n.2, Neal's showing appears even farther from the mark.

> **B.    Neal did not suffer prejudice; the evidence in question had little impeachment value and even if jury had believed Jarrell Neal stayed in the car, as a matter of law, he was still guilty as charged.**

>> **1.    Even if the jury had entirely disregarded Darby's testimony, and had believed Jarrell Neal never left the car, under Louisiana law, Jarell Neal was still guilty of first-degree murder.**

Neal's argument at trial was that he stayed in the car at the time of the murders. He says introduction of the three pieces of evidence in question would have advanced that specific argument. Yet, even if the three pieces of evidence *had* been introduced in their entirety, and even if this evidence *had* persuaded the jury that Neal stayed in the car at the time of the murders—under Louisiana law—Neal would still have been guilty of first-degree murder. Hence, as the state-post-conviction court correctly determined, Neal cannot show prejudice because the introduction of the evidence in question would not have created a reasonable probability of a different verdict.

As even the district court conceded, because Neal and his co-defendants "were apprehended by the police as they fled the scene, there was little dispute that the trio were involved in the commission of the offense and were each culpable to some extent." ROA.2926. Agreed. Under Louisiana law, clearly, Jarrell Neal was a principal to these homicides. Once this fact is conceded, the only remaining question is whether he had the intent necessary to satisfy first-degree murder.

And the answer is yes; even if Neal stayed in the car at the time of the murders, the jury could still—easily—conclude he had specific intent to kill or cause great bodily harm during the murders. In granting habeas relief, the district court claimed that if the jury disbelieved Arthur Darby's testimony, it would have been impossible for the state prove the necessary intent. And that is simply not the case. As a mental state, intent (in all its varieties) may be inferred from the circumstances of a person's actions. That is, intent (like any other element of a crime) can be proven circumstantially. And in this case, even if Neal did stay in the car during the murders, his undisputed actions after the murders were more than sufficient under Louisiana law to prove the requisite intent.

In Louisiana—like anywhere else—firing a high-powered assault rifle, multiple times, at multiple police officers, is sufficient to prove a specific intent to kill those officers. And it is not unreasonable to infer that a person, who had specific

intent to kill multiple police officers while fleeing *from* the scene of a double homicide, also possessed a specific intent to kill while that person was *at* the scene of the same double homicide. Indeed, under Louisiana law, the mere fact that Neal fled the scene of the homicides and attempted to avoid apprehension after these crimes was a sufficient basis upon which to infer he possessed guilty knowledge, and from this, that he possessed the requisite intent during these homicides. And this was a circumstance the jury was instructed it could consider. ROA.12903 (trial court's written flight instruction to the jury).

> **2.** **The district court seriously overstated the impeachment value of the three items of evidence in question and, in any event, it was dwarfed by the impeachment which was already before the jury.**

As discussed, the serology and footprint reports had comparatively little impeachment value which, in any event, was more than offset offset by their corresponding tendency to support, rather than contradict, the State's case. The blood on Arthur Darby's shoes had an innocent explanation and if the serology report was inculpatory toward Darby, it was equally inculpatory toward Jarrell Neal. The footprint report was entirely consistent with the State's case; the only detail not put in front of the jury was a fact which tended, if anything, to prove Zannie Neal's presence in the house—a fact that corroborated Arthur Darby's testimony and the State's prosecution theory.

47

The only inconsistency which was not brought out from Darby's February, 1999, statement was the fact that Darby said he did not see Jarrell with the AK-47 when he first left the car. But this statement was simply another example of a fact already developed by other testimony; namely that, before trial, Darby had tried to minimize his knowledge of and involvement in this crime. That fact is what was critical, and that fact was already before the jury.

Moreover, this inconsistency was essentially duplicative of other impeachment and was vastly less powerful than the other impeachment already before the jury. In its supplemental order, the district court claimed that "[d]espite the importance of Arthur Darby's testimony, it went largely unchallenged by defense counsel." ROA.3036. The state-court record proves otherwise. The defendant's trial counsel got Arthur Darby to admit, on the stand, in front of the jury, that he, Darby, would "do anything and say anything" to avoid the death penalty. ROA.7809:9-15. ("Q. … Man, you were charged with a crime that you can go and get death [for]. You'd do anything and say anything to save that fate, wouldn't you? A. Yes.").

Furthermore, the terms of Darby's plea agreement were before the jury and, in connection with this, the jury received an instruction from the trial court which encouraged them to treat Arthur Darby's testimony with extreme caution. The jury were instructed as follows:

An accomplice is defined as one who is associated with another in the commission of a crime. An accomplice is a competent witness, either for the state or for the defendant.

Whether the accomplice has been convicted or not, whether he has pleaded guilty or nolle pros, or dismissal has been entered into or whether he be joined in the same bill of information or indictment with a person or trial or not, corroboration is desirable, but it is not always indipensable [sic.].

The jury may convict on his uncorroborated testimony. And while it is not the rule of law, it is rather the rule of our experience in dealing with that class of testimony. While you may convict upon the uncorroborated testimony of an accomplice, still you should act upon his testimony with great caution, subject to great, careful, examination of the weight of the other evidence in the case

And you are not to convict upon such testimony alone, unless you -- unless satisfied after a careful examination of its truth, that you feel you can safely rely on it.

What the law means by corroboration of testimony of an accomplice, is not merely corroboration of the accomplice's narrative in the mere details of how the crime was committed or the crime charged was committed, but some real and independent corroboration intending [sic] to implicate the defendant in the commission of the offense charged.

It is not sufficient to corroborate an accomplice as to the facts of the case. Generally, he should be corroborated as to some material fact which tends to prove that the accomplice was connected with the crime that's charged.

ROA.7973:1-7974:11; *see* ROA.12902 (court's written instructions). The substance

of this instruction was echoed in the State's closing argument; the prosecutors

specifically asked the jury not to simply accept Arthur Darby's testimony at face-value. In closing arguments, the prosecutor advised the jury to "view accomplice testimony … with a very keen eye; look at it hard, please. I'm not vouching for Arthur Darby's credibility. I assure you [the other prosecutor is] not vouching for it either." ROA.7936:10-14.

To prove prejudice, Neal must prove there is "a substantial, not just conceivable, likelihood of a different result." *Shinn*, 141 S.Ct. at 523 (internal quotations omitted). He has failed to do so; if the jury in this case chose to believe Arthur Darby despite the extensive impeachment already before it, there is little reason to believe they would have hesitated do the same if presented with the marginal impeachment evidence upon which Neal bases his ineffective assistance of counsel claim. Even on de novo review, Neal simply cannot carry his burden of proving prejudice—still less, his burden of showing that the state court *unreasonably* applied *Strickland* to these facts. This, too, is fatal to Neal's ineffective assistance of counsel claim. Relief should not have been granted.

## CONCLUSION

For the reasons discussed in greater detail above, the district court's Judgment granting Petitioner, Jarrell Neal, habeas relief should be reversed, and his instant claims for relief should be dismissed with prejudice.

Respectfully submitted,

**PAUL D. CONNICK, JR.**
DISTRICT ATTORNEY
24th JUDICIAL DISTRICT
STATE OF LOUISIANA

**THOMAS J. BUTLER (La. Bar No. 22982)**
Assistant District Attorney
Chief of Appeals

**BY:**

*/s/ Matthew R. Clauss*
**MATTHEW R. CLAUSS (La. Bar No. 31664)**
Assistant District Attorney
Counsel of Record

OFFICE OF THE DISTRICT ATTORNEY
200 Derbigny Street
Gretna, Louisiana 70053
Telephone: (504) 368-1020

*Counsel for Respondent – Appellant*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 14th day of September, 2022, I electronically filed a copy of the foregoing complete and legible brief with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system and that further service will be accomplished by the appellate CM/ECF system.

*/s/ Matthew R. Clauss*
MATTHEW R. CLAUSS (La. Bar No. 31664)
Assistant District Attorney
Counsel of Record

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system: (1) the privacy redactions required by 5th Cir. R. 25.2.13 have been made, (2) the electronic submission is an exact copy of the paper document, and (3) the document has been scanned for viruses with Symantec Endpoint Protection and is free of viruses.

Dated: September 14, 2022.

*/s/ Matthew R. Clauss*
MATTHEW R. CLAUSS (La. Bar No. 31664)
Assistant District Attorney
Counsel of Record

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This motion complies with the type-volume limitation of Fed. R. App. P. 32(a) (7) (B) because it contains 11,594 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2207 Build 16.0.15427.20166) 32-bit in Equity A 14-point in the main text.

Dated: September 14, 2022

> */s/ Matthew R. Clauss*
> MATTHEW R. CLAUSS (La. Bar No. 31664)
> Assistant District Attorney
> Counsel of Record