No. 22-70007

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**JARRELL NEAL,**
*Petitioner-Appellee*,

*v.*

**DARREL VANNOY,**
**WARDEN, LOUISIANA STATE PENITENTIARY,**
*Respondent-Appellant.*

---

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
**USDC No. 2:15-CV-5390**

---

**ORIGINAL BRIEF FOR THE APPELLEE**

---

# THIS IS A CAPITAL CASE

Rachel I. Conner
3015 Magazine Street
New Orleans, LA 70115
504-581-9083
Email: rachel@connerdefense.com
*LEAD ATTORNEY*
*Designation: CJA Appointment*

Cecelia Trenticosta Kappel
1024 Elysian Fields Ave.
New Orleans, LA 70117
504-529-5955
Email: ctkappel@defendla.org
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of these proceedings. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Appellant</u>: Darrel Vannoy, Warden, Louisiana State Penitentiary[1]

<u>Attorneys for Appellant</u>: District Attorney, 24th Judicial District Paul D. Connick, Jr.; Assistant District Attorney Thomas J. Butler; Assistant District Attorney Juliet L. Clark; Assistant District Attorney Matthew R. Clauss.

<u>Appellee</u>: Jarrell Neal

<u>Attorneys for Appellee</u>: Cecelia Trenticosta Kappel, Rachel I. Conner

<u>United States District Judge:</u>
Hon. Nannette Jolivette Brown

This 14th day of November, 2022

<u>/s Cecelia Trenticosta Kappel</u>
Cecelia Trenticosta Kappel

---

[1] The current warden of the Louisiana State Penitentiary is Timothy Hooper, however, Mr. Neal lists former Warden Vannoy to be consistent with the case caption.

**STATEMENT REGARDING ORAL ARGUMENT**

Because this case can be sufficiently determined on the record based on well-established legal principles, and a complex factual background analyzed in detail below, oral argument is unnecessary to aid the Court's decisional process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ...................................................................................... iv

TABLE OF AUTHORITIES ................................................................................. vi

ISSUES PRESENTED FOR REVIEW .................................................................1

STATEMENT OF THE CASE ...............................................................................1

   I.  Statement of the Facts ...............................................................................1

   II.  Law Enforcement Investigation ...............................................................3

SUMMARY OF ARGUMENT .............................................................................20

ARGUMENT .........................................................................................................21

   I.   Whether viewed through § 2254(e)(1) or § 2254(d), the State Court Decision finding that Trial Counsel made "Strategic Choices" was Not Entitled to Deference where the Only Evidence before the State Court Regarding Strategy was Trial Counsel's Sworn Declaration Stating that if he Received this Evidence, he "Would Have Used [it] at Trial to Undermine the Prosecution's Case" ........21

      A. The State Waived the Argument that a State Court Finding of "Strategy" Constitutes a Purely Factual Finding under § 2254(e)(1) ................................21

      B. The State's Argument would have Failed Even if it had Been Preserved ..24

      C. Clear and Convincing Evidence Rebutted the State Court's Finding that Trial Counsel's Omissions were Part of a Trial Strategy .........................................25

   II.  Trial Counsel's Deficient Performance at this Capital Trial Rendered the Verdict Unworthy of Confidence.......................................................................30

      A. The State Court Unreasonably Applied Clearly Established Federal Law Requiring Courts to Determine Whether Trial Counsel's Strategy is *Objectively Reasonable* ........................................................................................................31

B. The State Court Decision on the Deficient Performance Prong Rested on an Unreasonable Application of Clearly Established Federal Law ......................34

C. The State Court's Finding as to Prejudice was Objectively Unreasonable—Counsel's Errors Undermine Confidence in the Verdicts ...............................42

CONCLUSION ....................................................................................................51

CERTIFICATE OF SERVICE ...............................................................................52

CERTIFICATE OF COMPLIANCE ......................................................................53

# TABLE OF AUTHORITIES

## Cases

*AG Acceptance Corp. v. Veigel*, 564 F.3d 695 (5th Cir. 2009) ...............................31

*Anderson v. Johnson,* 338 F.3d 382 (5th Cir. 2003)...............................................42

*Anthony v. Louisiana*, 598 U.S. __ (Nov. 7, 2022)...................................................56

*Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995)........................................................41

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir.1990) ...............................................42

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................... passim

*Brumfield v. Cain*, 576 U.S. 305 (2015) .................................................................31

*Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994)................................................ 51, 57

*Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001).................................................40

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014) .............................................40

*Harrison v. Quarterman*, 496 F.3d 419 (5th Cir. 2007) .........................................57

*Hughes v. Vannoy*, 7 F.4th 380 (5th Cir. 2021) ......................................... 43, 45, 59

*Isaac v. Cain*, 588 F. App'x 318 (5th Cir. 2014).....................................................39

*Johnson v. Scott*, 68 F.3d 106 (5th Cir. 1995) .................................................. 26, 59

*Kemp v. Leggett*, 635 F.2d 453 (5th Cir.1981) .......................................................42

*Kyles v. Whitley*, 514 U.S. 419 (1995)....................................................................59

*Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899 (8th Cir. 2014) ................38

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ...................................................39

*Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013) ...................................................33

*Nealy v. Cabana*, 764 F.2d 1173 (5th Cir.1985).....................................................42

*Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003) ................................................38

*Powell v. Alabama*, 287 U.S. 45 (1932) .................................................................42

*Rhodes v. Vannoy*, 751 F. App'x 524 (5th Cir. 2018) ....................................... 46, 59

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ............................. 33, 38, 57

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................................42

*Shinn v. Ramirez*, 142 S. Ct. 1718 (May 23, 2022) ..................................................29

*State v. Brooks*, 505 So. 2d 714 (La. 1987) ............................................................52

*State v. Martin*, 376 So. 2d 300 (La.1979) .............................................................53

*State v. Monroe*, 397 So. 2d 1258 (La.1981) ..........................................................53

*State v. Mussall*, 523 So. 2d 1305 (La.1988) ..........................................................44

*State v. Prudholm*, 446 So. 2d 729 (La.1984) .........................................................39

*State v. Sonnier*, 402 So. 2d 650 (La.1981) ............................................................53

*State v. West*, 568 So. 2d 1019 (La. 1990) ..............................................................52

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................. passim

*United States v. Zuniga*, 860 F.3d 276 (5th Cir. 2017) ...........................................31

*Wardrip v. Lumpkin*, 976 F.3d 467 (5th Cir. 2020) .................................................33

*Whelchel v. Washington*, 232 F.3d 1197 (9th Cir. 2000) ........................................38

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................................41

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................................... 40, 58

*Wood v. Allen*, 558 U.S. 290 (2010) ........................................................................33

*Wood v. Milyard*, 566 U.S. 463 (2012) ...................................................................32

*Young v. Dretke*, 356 F.3d 616 (5th Cir. 2004) ......................................................32

## Statutes

La. Code Crim. P. art. 930 ........................................................................................22

La. Rev. Stat. § 14:30 ...............................................................................................52

La. Rev. Stat. § 14:30.1 ............................................................................................52

## Other Authorities

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL
    IN DEATH PENALTY CASES, GUIDELINE 11.4.1 ...................................................46

ABA STANDARDS FOR CRIMINAL JUSTICE: DUTY TO INVESTIGATE AND ENGAGE
    INVESTIGATORS 4–4.1(c) (4th ed. 2015)..............................................................42

**Rules**

Fed. R. App. P. 28 ...................................................................................31

La. Sup. Ct. R. XXXI .............................................................................16

## ISSUES PRESENTED FOR REVIEW

1. Whether the State waived the argument that the state post-conviction court's finding of "strategy" as a basis for trial counsel's failure to investigate, present favorable evidence, and impeach a critical state witness was subject to 28 U.S.C. § 2254(e)(2) rather than 28 U.S.C. § 2254(d)(1), or in the alternative, if the argument was not waived, whether the state court's finding of "strategy" was rebutted by the clear and convincing evidence in trial counsel's sworn declaration.

2. Whether the state post-conviction court's decision denying relief was unreasonable under 28 U.S.C. § 2254(d) where trial counsel evidently had in his possession, but failed to review or utilize, critical forensic reports and a materially inconsistent statement of a key witness.

3. Whether the district court correctly found that the ineffective assistance of trial counsel in this case violated Jarrell Neal's Sixth and Fourteenth Amendment rights and entitled him to a grant of habeas relief.

## STATEMENT OF THE CASE

### I.    Statement of the Facts

Gregory Vickers and Fergus Robinson were shot and killed at 1333 Wilson Street in Jefferson Parish, Louisiana, shortly before midnight on March 31, 1998. *See* ROA.7515. Three men were indicted for these murders: Arthur Darby and his two nephews, Zannie and Jarrell Neal. ROA.3996. In exchange for testifying against

Jarrell and Zannie, Darby pled guilty to two counts of manslaughter and was sentenced to twenty years imprisonment. ROA.7790. Jarrell Neal was convicted of first degree murder and sentenced to death. Subsequently, Zannie Neal was convicted by non-unanimous verdict of second degree murder. No forensic evidence connected Jarrell Neal to the scene of the murders.[2]

Fergus Robinson was a known crack dealer who stored drugs at 1333 S. Wilson Street, and Gregory Vickers was a frequent customer of his. ROA.3383, ROA.7829-30. Robinson was also dating Claudette Hurst, who lived at the house. ROA.7829. That night, Ms. Hurst's brother, Carl Duncan, and his friend Keinna Porter, were in the front bedroom smoking marijuana. ROA.7528. Ms. Hurst was sleeping on a sofa in the den. ROA.7494-95.

Ms. Hurst reported that she awoke to Mr. Robinson telling someone to "take it outside." ROA.7496. When she got up, she saw "a tall, thin person dressed in black clothing" standing over Mr. Vickers with a long gun in his hand in the front room. ROA.7516-17; *State v. Neal*, 796 So. 2d 649, 652 (La. 2001). She and Mr. Robinson ran into the front bedroom, and Mr. Duncan and Mr. Robinson held the door shut, but someone fired a gun into the closed door. ROA.7497-98.

---

[2] *See* ROA.7853 (Lt. Buras admitting that it could have been Darby who committed the murders while Jarrell remained in the car).

Mr. Robinson suffered a single fatal gunshot wound in his right thigh. Mr. Vickers was found deceased near the side door with two gunshot wounds. Mr. Robinson was found holding twelve rocks of crack cocaine in his hand, and Mr. Vickers had a crack pipe in his back pocket. ROA.7760-61. Both tested positive for cocaine. ROA.7472.

No eyewitness identified Jarrell Neal as the shooter or accomplice to the killing. Eyewitness Claudette Hurst described the shooter as being tall and slim, a description more fitting of five-foot-eleven, 165-pound Arthur Darby than five-foot-nine, 210-pound Jarrell Neal.[3] ROA.6400, 12209. He was wearing all black clothing.[4]

## II.    Law Enforcement Investigation

Jefferson Parish Sheriff's Deputy Derrick McGee was dropping his father off around the block from 1333 Wilson when they heard several gunshots, and then saw a black Toyota 4-Runner heading east. ROA.7589. He got into his marked police

---

[3] Indeed, at Zannie Neal's subsequent trial, Claudette Hurst initially identified Arthur Darby as the shooter on cross-examination before testifying on re-direct that Darby was the height of the shooter. ROA.8665.

[4] Although the State's brief obfuscates the shooter's clothing by stating that Ms. Hurst saw "nothing but all black," *State's Brief* at 3, the trial transcript is abundantly clear that she described the shooter a slim man in black clothing. *See*, *e.g*., ROA.7516-7517 ("Q. Then I think you described an individual in all black. A. Yes."); *id*. ("Q. And the individual was all in black, is that correct? A. Yes."); ROA.7518 ("Q. And this was that slim, described as a very slim man? The one that raised the gun, all in black, tall and slim; isn't that right? A. Yes."). The Louisiana Supreme Court thus described the shooter as wearing "black clothing." *Neal*, 796 So. 2d at 652. In fact, when Ms. Hurst stated that she had seen "nothing but all black," she had just been asked by the prosecutor about the *color of the clothing* of the shooter. ROA.7496.

vehicle and followed the 4-Runner; after he called for backup, another JPSO vehicle joined the pursuit. ROA.7597, ROA.7601.

As the 4-Runner crossed over railroad tracks, the deputy saw a muzzle flash out the passenger's side window or door, and the passenger was thrown out of the vehicle and hit the ground. ROA.7603, 7605. Now unarmed, he ran towards JPSO deputies, where they grabbed him and handcuffed him face-down on the ground. ROA.7605-06, 7668. Jarrell Neal was identified at trial as the person who shot out of the 4-Runner. ROA.7604. No officer was harmed, and no glass was broken in the JPSO vehicles. ROA.7653.

Meanwhile, Darby fled in the 4-Runner before bailing out and hiding for about 15 minutes until a K-9 unit found him. ROA.7692. Zannie Neal was found in the back seat after the vehicle crashed. ROA.7690-91.

At the time of arrest, Darby was wearing a black sweater or sweatshirt and jeans. ROA.1409, 7697. Jarrell Neal had on khaki pants. ROA.7631. Darby was thin, while Jarrell was not. ROA.7808, 7842.

Only Ms. Hurst saw a perpetrator in the house. She gave a statement to law enforcement describing this man as tall, thin, and dressed all in black. ROA.10366. Darby gave a taped statement to the police on April 1, 1998, claiming that he was an unwitting driver while Jarrell and Zannie got out of the car and committed the murders. ROA.3356-70. He claimed that Jarrell had the rifle, that Zannie had a 9mm

handgun, and that there was a .38 in the car. ROA.3362. Prosecutors disclosed this statement to defense counsel, on the record, before trial. ROA.3433.

Ballistics testing concluded that the casings found in the home, and the fragments found during the autopsy, were fired from the MAK-90 recovered from the arrest scene. ROA.3388, 7879-80. All three suspects tested positive for gunshot residue. ROA.7837. Fingerprint examination of the casings and weapons did not yield any usable prints. ROA.7834.

Of significance for this appeal are two scientific reports. First, a bloody shoeprint was found on a tile inside the house. ROA.7727. The State's forensic analysis concluded that Darby's and Jarrell's shoes were excluded as the source of the shoeprint; however, Zannie's shoes could not be excluded. ROA.3345. Second, JPSO conducted serology testing on several items in evidence, including the clothing and shoes worn by the suspects at the time of arrest. Item number 78 was a pair of work boots worn by Jarrell Neal at the time of arrest, and item number 13 was a pair of tennis shoes worn by Darby. Both tested positive for the presence of blood. ROA.10123. Threads of the presumptive blood stains from the shoe marked "DARBY" were created and preserved by the analyst for possible DNA testing. ROA.10122-23.

## III.   Procedural History

### A. Pretrial

Jarrell Neal was indicted for first-degree murder on May 21, 1998. ROA. 3997. The Neal family hired attorneys Robert Glass, an experienced capital practitioner, for Zannie, and Ralph Barnett, a solo practitioner in the area, for Jarrell. In preparation for this capital trial, Barnett filed a total of four pretrial motions, two of the four seeking discovery. ROA.3998-4002. He filed no subpoenas. During the two short hearings that were held prior to Jarrell Neal's trial, Barnett did not examine any witnesses.

The only significant pretrial litigation in this case concerned discovery, and was conducted primarily by Glass. Barnett joined in a motion for discovery and inspection filed by Glass, which demanded that the prosecution (1) disclose whether or not forensic analysis was requested, and, if so, (2) provide results. ROA.3447, ROA.8160.

On October 22, 1998, the prosecution disclosed a ballistics analysis report, ROA.4007, and promised the results of gunshot residue analysis upon receipt. ROA.8192. At a December 17, 1998 joint hearing, Glass asked that the prosecution supplement its response to the demand for forensic analysis. The prosecutor responded that he had not received the results from the GSR analysis. ROA.3446.

However, at that time, the prosecution had already requested shoeprint analysis, and had received the completed serology report. On April 25, 1998, the JPSO crime lab conducted testing, and the final serology report finding possible

blood on Darby's shoe was dated December 8, 1998. ROA.3330. On October 14, 1998, the JPSO crime lab had conducted analysis on the bloody shoeprint. ROA.3345.[5]

The day before trial was set to begin, the prosecutors and Lt. Buras went to the jail to re-interview Darby. ROA.3346. This time, when Lt. Buras asked what kind of gun Jarrell had when he got out of the car, Darby responded: "I didn't see [a gun] when he got out." ROA.3349. Later, Lt. Buras asked again: "Did you notice any weapons when they first got out?" Darby responded: "No." *Id.*

## B. Trial

Nine months after indictment, and less than eleven months after the offense, Jarrell Neal's trial began. Barnett was operating as a "one-man" team in defending Jarrell Neal against capital murder. *See* ROA.5738. In fact, just before voir dire, the court put on the record that it had called the head of the Indigent Defender's Office to a pre-trial conference and offered to appoint a second attorney,[6] and Barnett had "waived" that offer, opting to try both the guilt and penalty phases alone.[7] ROA.4126-27.

---

[5] The final report was dated January 6, 1999. ROA.3345.

[6] Pursuant to La. Sup. Ct. R. XXXI, promulgated in 1994, no less than two capital certified attorneys must be appointed to represent an indigent capital defendant.

[7] *See also* ROA.5738-40 (trial counsel admitting to failing to take proper notes during voir dire and confirming again that he refused help from the court and Indigent Defender's Office).

Voir dire began on February 23, 1999, and a jury was sworn in by February 25. Just after noon on February 25, the State made its opening statement. ROA.3988. Barnett waived opening statement. ROA.7459. The State presented its case over the next two days and rested on February 27. ROA.3992.

The State's evidence at trial fell into two categories. First, the State used the fact that Jarrell was identified as the individual who shot at police vehicles during the chase to argue to the jury that Jarrell must have been the shooter of Vickers and Robinson. ROA.5538. Ballistics testing concluded that the casings found at the crime scene were consistent with the MAK-90. ROA.5483-85. The prosecution elicited improper testimony from Deputy McGee that "if you kill a police officer, you'd kill anybody, basically." ROA.5243.

Second, the State presented the testimony of Arthur Darby. The State allowed Darby to plead guilty to manslaughter and receive a 20-year sentence in exchange for testifying. ROA.7790. According to Darby's testimony at trial, at 9:30 or 10:00 p.m. on March 31, 1998, he was asleep in his uptown New Orleans house when Jarrell and Zannie arrived. ROA.7791. Zannie explained that someone owed him some money for drugs that he needed to collect and he "might need a driver." ROA.7792. Darby put on a black sweatshirt. ROA.7794, 7808. The three got in Zannie's car, with Zannie driving. Zannie asked if Darby had his .38, which he did not, and so they went back to retrieve the weapon. ROA.7795. From there, they

drove to Kenner. According to Darby, when they arrived, Zannie told him to wait in the driver's seat while he went to collect his money. ROA.7795-96. Darby testified that Zannie and Jarrell got out of the car, Jarrell carrying a rifle and Zannie carrying nothing; shortly after, he heard some shots, and then his nephews came running back to the car—Jarrell with the rifle and Zannie with a pistol. ROA. 7797-98. Darby testified that Jarrell made an inculpatory statement to him in the car about shooting the victims. ROA.7799. Darby then sped away from the scene. ROA.7800. He testified that Jarrell shot once or twice at the police, and after a police car pulled in front of him, he jumped out of the window and ran. ROA.7802.

Just before Darby took the stand at trial, Barnett reasserted that the defense was entitled to all of Darby's prior statements. ROA.7777. In response, the prosecutor handed him a statement purportedly handwritten by Darby and dated February 22, 1999. ROA.7779-80. Barnett asserted that the defense was also entitled to "any other statements he may have made." ROA.7779.

When the court asked the prosecutor if he was willing to give a copy of the taped statement to the defense, the prosecutor refused and represented to the trial court that the taped interview of Darby made on February 22, 1999 was "totally consistent" with the (April 1) statement the defense had. ROA.7780 (prosecutor "assur[ing] the Court there is no '*Brady*' material in the statement."). The court then ordered a copy to be put into the record for appellate review. *Id*.

9

Subsequently, the prosecutor provided a copy of the taped statement for *in camera* inspection. ROA.7783-84. The prosecutor entered the taped statement as "State's 96 *for the Court only*." ROA.7784 (emphasis supplied.). There is no further mention of this tape in the transcript. The minute entries for trial, however, note that, after reviewing the tape, the court found "two *Brady* statements." ROA.3990. There is no indication whether any portion of the statement was provided to defense counsel or in what form.

Barnett rested without presenting any evidence. The jury returned a verdict of guilty. ROA.3992. Penalty phase took less than six hours including lunch. ROA.3993-94. After deliberating for two hours, the jury sentenced Jarrell Neal to death, and he was formally sentenced on June 4, 1999. ROA.3994, 8123.

### C. Direct Appeal

In May of 1999, the court granted a spate of motions filed by Glass requesting access to the State's evidence and scientific testing. ROA.8322-68. Five days after Jarrell's sentencing, on June 9, 1999, the State disclosed the shoeprint and serology analysis reports—to Glass—and made a record of this disclosure in open court. ROA.3971, 8488.

During Zannie's trial, Ms. Hurst maintained that the shooter was tall, slim, and wore all black. ROA.8662. On cross-examination, defense counsel asked Darby to come forward in the courtroom. The following exchange then occurred:

Q.    Ms. Hurst, is this the tall black figure that you saw at your residence that night?

A.    Yes.

ROA.8665. The jury came back with non-unanimous guilty verdicts of second-degree murder. ROA.5775, 6441-46.

While on direct appeal, Jarrell's appellate counsel reviewed Zannie's appellate record and discovered the forensic reports of the serology and shoeprint examinations within the exhibits. ROA.3675, 17889-17901. Counsel raised a *Brady v. Maryland*[8] claim, asserting that these reports were material and favorable to Jarrell's defense. ROA.3674-80. Additionally, counsel asserted a discovery violation due to the State's refusal to disclose Darby's February 22, 1999 taped statement. ROA.3680-81.

In response, the State argued that the shoeprint and serology reports were not material to the defense, and that the defense was not entitled to discovery of the prior statement made by Darby because "the State did not use it at trial." ROA.3759-61. Following oral argument, the State moved to supplement the record with an unsigned letter purporting to disclose the shoeprint and serology reports to Barnett, and a certified mail receipt signed by Barnett dated two weeks after the letter, but with no indication of the contents or to which case it related. ROA.3818-24.

---

[8] 373 U.S. 83 (1963).

Noting that "the state's case against the defendant depended in large part on the jury believing Arthur Darby's testimony,"[9] the Louisiana Supreme Court held that there was insufficient evidence to determine whether the reports were disclosed, and ordered that the claim should be "relegated to post-conviction relief, where an evidentiary hearing may be conducted to develop a sufficient record on the issues raised."[10]

As to Darby's February 22, 1999 statement, the court found that the State had no obligation to produce his prior statements unless they contained *Brady* material, and "[o]n the present record," the defense failed to show that Darby's statement had exculpatory or impeachment material. ROA.12171.

### D. Post-Conviction

During post-conviction proceedings, counsel was finally able to get access to a cassette tape with Darby's taped statement.[11] ROA.10937. Though much of the recording was inaudible, counsel was able to make out portions of the statement that would have been valuable impeachment evidence at trial. Post-conviction counsel raised a *Brady* violation, and, alternatively, ineffective assistance of counsel, regarding Darby's February 22, 1999 statement, the serology report and worksheets,

---

[9] *Neal*, 796 So. 2d at 656.

[10] *Id.* at 660.

[11] ROA.10929 (detailing post-conviction counsel's extensive efforts to gain access to evidence).

and the shoeprint report and examiner's notes, among other items.[12] Submitted in support was a sworn declaration by. Barnett, stating *inter alia* that:

> I handled the case the case alone, and I did not have co-counsel or an investigator on the case. I did not review the physical or forensic evidence in the case, and I did not use any experts in preparation for the trial.

ROA.10250. Counsel asserted entitlement to an evidentiary hearing under La. Code Crim. P. art. 930(A). ROA.10926-27.

In response, the State claimed that the reports had been sent to Barnett under the unsigned cover letter.[13] As to Darby's taped February 22, 1999 statement, the State, reversing course, now claimed that it had been turned over and pointed to a portion of the trial transcript where Barnett acknowledged "And I do have that statement." ROA.7776. However, the context of the transcript is clear that Mr. Barnett was referring to the April 1, 1998 statement. ROA.7775-76. The State made no argument regarding the materiality of Darby's statement. ROA.12063.

The State did not respond to the alternative ineffective assistance of counsel claim. Instead, State argued that the serology report was inculpatory to Mr. Neal because it documented the presence of blood on his own shoes; however, the State

[12] Counsel also alleged the State withheld letters between Zannie and Darby demonstrating their close relationship, a plea deal for State's witness Keinna Porter, and initial and supplemental police reports. ROA.10947-64.

[13] The State did not provide any affidavit from either trial prosecutor stating that the documents had been turned over, and rested its contention solely on the letter and certified mail receipt.

also acknowledged that "the same report documents the possible presence of blood on specimen #13. These are Darby's shoes." ROA.12061. The State also argued that the document was disclosed to the defense. As to the shoeprint, the State argued that the report was not exculpatory because it was consistent with the State's theory at trial that Zannie entered the house with Jarrell. ROA.12062. The State did not address Barnett's sworn declaration. In his Reply, Mr. Neal renewed his request for an evidentiary hearing. ROA.12270-71.

Five months later, the state post-conviction court issued a written decision denying all claims without a hearing. The court did not mention Mr. Neal's repeated requests for a hearing, or the Louisiana Supreme Court's decision relegating the claims to post-conviction specifically for the purpose of conducting a hearing to determine whether the reports were in fact disclosed to defense counsel. With regard to the *Brady*—and alternative ineffective assistance of counsel—claims arising out of the serology and shoeprint reports, the court ruled:

> Upon review, the forensic reports do not necessarily exculpate the defendant or exclude him as the source of a bloody shoe print. Furthermore, the reports were provided to defense counsel in a letter sent via certified mail January 19, 1999 for which defense counsel signed acknowledging receipt. In addition, defense counsel's sworn affidavit confirms that it is his signature on the postal return receipt card.
>
> Defendant also contends that the State failed to provide inconsistent statements of Arthur Darby in violation of *Brady*. This claim is without merit. The defendant has not demonstrated how disclosure was

untimely or prejudicial to his case. The record indicates that defense counsel had each of the statements to which the defendant refers.

ROA.17080.

In its ruling on the ineffective assistance of counsel claim, the state court found that trial counsel's "investigation" and cross-examination of witnesses were "strategic choices." ROA.17081; s*ee* ROA.15139-76. Separately, and alternatively to the *Brady* claim, Mr. Neal raised the ineffectiveness of counsel for failing to consult with forensic experts and test the forensic evidence, including the shoeprint and blood on Darby's shoe. ROA.15199. In the context of that claim, the court held that:

> Counsel's decisions were trial strategies which do not constitute ineffective assistance of counsel. Furthermore, the defendant has not shown that he was prejudiced by counsel's decisions regarding experts. Defendant's conviction would remain unchanged when considered in light of his role as a principal.

ROA.17082. Mr. Neal filed a motion to reconsider the court's failure to order a hearing in light of the Louisiana Supreme Court's admonition that a hearing was needed to resolve factual disputes, which was denied without reasons. ROA.17087, 17092.

**E. Federal Habeas**

Mr. Neal timely filed a petition for writ of habeas corpus, asserting, *inter alia*, *Brady* and alternate ineffective assistance of counsel claims regarding the reports and statement. ROA.35-284. Mr. Neal also supplemented his petition with results

from DNA testing concluding that the blood on Darby's shoe matched that of victim Gregory Vickers.[14] ROA.1330, 1437-51.

Mr. Neal filed a Motion for Partial Summary Judgment, asserting no genuine dispute of material fact regarding the denial of due process and a fair trial due to the suppression of material impeachment and favorable evidence—the serology and shoeprint reports and notes, and Darby's February 22, 1999 statement.[15] ROA.2060. Under the § 2254(d) standards, Mr. Neal asserted that the state court's decision regarding disclosure and materiality was unreasonable in light of the record before the court. ROA.2081-83. Mr. Neal also asserted that, in the alternative to the *Brady* claim, trial counsel was ineffective for failing to review, investigate, or make any use at trial of these items. ROA.2086-88 (noting that, under *Johnson v. Scott*, 68

---

[14] Though not relevant for the purposes of this Appeal, in May 2020, the State re-tested many other items of clothing and shoes in evidence. In response to the finding that Vickers' DNA was on Darby's shoe, the State proceeded to argue, as it does before this Court, that the Jefferson Parish Sheriff's Office so bungled the investigation of these homicides as to mislabel clothing and shoes as belonging to the wrong suspects. *See State's Brief*, at 18. To be clear, until the results of the February 2019 DNA testing by Jarrell Neal's defense team were revealed, the State has maintained that Item #78 referred to the boots worn by Jarrell Neal and Item #13 referred to the shoes worn by Darby. The JPSO Scientific Analysis Report reads: "78 One pair of black HONCHOS-Steel Toe work shoes from suspect (Neal, Jarrell)," and the serology report lists Item #78 as "One pair of black HONCHOS-Steel Toe work shoes from (Neal, Jarrell)." ROA.3330-31. The State also previously represented in both state and federal court that Jarrell wore #78, and Darby wore #13. ROA.811 (referring to "the shoes worn by petitioner (specimen #78) and these worn by Arthur Darby (specimen #13)"); ROA.1477 (referring to "petitioner's shoes"); ROA.12061 ("Specimen #78 is the pair of boots the defendant was wearing," and as to specimen #13, "these are Darby's shoes"). The *State's Brief* also misrepresents the results of the DNA analysis—in fact, the habitual wearer of the boots could not be identified by DNA. ROA.2172.

[15] For purposes of this Appeal, undersigned counsel assumes that the State disclosed the documents at issue to Barnett, despite a complete lack of evidence in the record establishing disclosure.

F.3d 106, 109-10 (5th Cir. 1995), the *Brady* materiality standard is identical to the prejudice standard under *Strickland*).

The district court ultimately denied summary judgment, but issued a 62-page written opinion addressing whether the state court's decisions on the relevant issues constituted an unreasonable factual finding or an unreasonable application of federal law under § 2254(d). ROA.2275-2336. The court concluded that the state court's decision finding that the serology and shoeprint evidence had been disclosed was objectively unreasonable based on the record before it. ROA.2310. Moreover, the court found the state court's alternate finding of no prejudice because "the forensic reports do not necessarily exculpate the defendant or exclude him as the source of a bloody shoe print" was an unreasonable application of federal law. ROA.2311-2314.

As to Darby's statement, the court found that "there was no evidence before the state court to support its factual finding that the taped statement was ever provided to defense counsel." ROA.2317. In light of the trial record and the State's concession that the state court finding of disclosure of the statement was "error,"[16] the court found that the state court's ruling was objectively unreasonable. ROA.2317.

The district court found, as the Louisiana Supreme Court had on direct appeal, that a hearing was necessary on the narrow issue of disclosure. ROA.2320, 2335-36.

---

[16] ROA.815.

At the hearing, trial counsel confirmed that he received a letter from the District Attorney's Office as evidenced by the return receipt, but did not remember the contents. ROA.3163. Although he lacked memory as to receiving—or not receiving—the evidence at issue, trial counsel made clear that:

> If I had known about it, of course, I would have tried to use that in the court in defense of my client. And if I had read it and didn't use it, then I made a big mistake.

ROA.3214.[17] *See also* ROA.3215 ("If I didn't [receive the shoeprint analysis], then that's on them. If I did, that mistake is on me."). As to the audiotaped statement from February 22, 1999, Mr. Barnett could not recall if he was provided access to the tape, but was certain that he had "no one but myself" on the defense team at trial. ROA.3215. The State presented a former appellate prosecutor as a witness, who testified that he discovered the unsigned letter on original letterhead, and the return receipt, albeit stored in different places, in the State's "felony file" during direct appeal. ROA.3220-24.

The district court issued a decision on May 20, 2022, granting relief on the alternative ineffective assistance of counsel claim. First, the court denied the *Brady* claim on the element of suppression: "Considering the stringent AEDPA standards applicable here, the Court upholds the state trial court's factual finding that these

---

[17] This testimony largely reflected the content of the sworn declaration that was before the trial court in post-conviction proceedings. *See* ROA.10250.

items were disclosed to the defense." ROA.2970. Analyzing the remaining alternative ineffective assistance of counsel claim under *Strickland v. Washington*[18] and the § 2254(d) standards, the court concluded that trial counsel's failure to impeach Darby's credibility and call into question his version of events was both deficient and prejudicial. ROA.2984-86. The court found that the state court's ruling that trial counsel's actions were "sound trial strategy," without providing any additional reasoning to support its conclusion, was objectively unreasonable in light of trial counsel's own admissions in his August 16, 2011 sworn declaration which was properly before the state court. ROA.2981-82.

To determine prejudice, the court examined the direct appeal decision, which found that the jury had accepted Darby's version of the events even though the State's only eyewitness had described the shooter as having "Darby's clothing and physique." ROA.2985-87. Darby was the State's key witness, without whom it would not have been able to prove specific intent to kill the victims. *See id.* Ultimately, the court found that the state court's denial of Mr. Neal's ineffective assistance of counsel claim based on his failure to use the serology and shoeprint

---

[18] 466 U.S. 668 (1984).

evidence and February 22, 1999 statement were contrary to, or an unreasonable application of clearly established federal law.[19] ROA.2929. The State appealed.[20]

## SUMMARY OF THE ARGUMENT

Based entirely on the state court record, the district court correctly found that under the § 2254(d) standard, the state court's finding that trial counsel was not ineffective for failing to use critical forensic reports and prior inconsistent statements was an unreasonable application of *Strickland* and its progeny. ROA.2929. Without holding a hearing, the state court had before it only the trial record and an affidavit of trial counsel admitting his failures were not strategic decisions; as the district court determined, a finding of strategy in the face of this clear and convincing evidence was unreasonable. Mr. Neal was prejudiced by this deficient performance, as they dismantle the central tenants of the State's entire theory, which centered around Arthur Darby's testimony; without this vital impeachment evidence, his

---

[19] Separately, the district court also granted relief on Mr. Neal's procedurally defaulted ineffective assistance of counsel claim—the failure of both trial counsel and post-conviction counsel to subject Darby's shoes to DNA testing, which would have revealed that the blood on his shoe belonged to victim Gregory Vickers. ROA.2997. The district court withdrew this portion of its ruling in the abundance of caution following *Shinn v. Ramirez*, 142 S. Ct. 1718 (May 23, 2022), and issued a renewed ruling. ROA.3034-48. The court made clear that "the state court record standing alone demonstrates that Petitioner was denied effective assistance of counsel" and that "the law and justice require relief." ROA.3048.

[20] Because the court granted relief based on the alternative ineffective assistance of counsel claim as to the serology and shoeprint analyses and Darby's statement, and denied relief on Mr. Neal's *Brady* claim, Mr. Neal's other pending claims were rendered moot. *See* ROA.2999. However, should this Court reverse or modify the district court's ruling, Mr. Neal would request a remand for consideration of the 21 remaining claims. *See* ROA.36-37, 1238-45, 1315-29.

credibility before the jury was largely unchecked, and rendered the verdict and sentence devoid of confidence.

## ARGUMENT

I.     **Whether viewed through § 2254(e)(1) or § 2254(d), the State Court Decision finding that Trial Counsel made "Strategic Choices" was Not Entitled to Deference where the Only Evidence before the State Court Regarding Strategy was Trial Counsel's Sworn Declaration Stating that if he Received this Evidence, he "Would Have Used [it] at Trial to Undermine the Prosecution's Case"**

This Court need not reach the question of whether a state-court determination that trial counsel's omissions were "strategic" is subject to § 2254(e)(1) or § 2254(d)(1) or (d)(2) because it is not properly preserved. At no point prior to the district court's judgments did the State argue that the state court's findings of strategy were subject to § 2254(e)(1), and there is therefore no ruling from the district court on this issue. This Court should not rule on an issue the State failed to raise below. However, even if this Court decides to address the issue, it has no merit. A finding of strategy under *Strickland* does not answer the ultimate question of whether counsel's performance was constitutionally effective; moreover, clear and convincing evidence in the record rebuts the state court finding of strategy.

### A. The State Waived the Argument that a State Court Finding of "Strategy" Constitutes a Purely Factual Finding under § 2254(e)(1)

In the seven-year history of this litigation, the State has had numerous opportunities to argue that the state court finding of "strategic choices" was a purely factual issue subject to 28 U.S.C. § 2254(e)(1). It did not, until after the district court

issued its ruling granting relief.[21] In its opposition to Mr. Neal's habeas petition, the State simply responded to the merits of the claims. *See*, *e.g.*, ROA.810, 815. Later, the State argued that Mr. Neal had not rebutted the state-court factual finding that the evidence at issue was *disclosed* to defense counsel by clear and convincing evidence. *See* ROA.2147. The district court would ultimately agree. *See* ROA.2332. However, the State has never argued, and cannot point to a single place in the record where it argued, that the finding of *trial strategy* was a purely factual finding subject to § 2254(e)(1). The State's mere quoting of the language of a statute, without articulating a particular legal argument, does not preserve that argument for review by this Court. *See AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009) (stating "this Circuit's general rule" that "arguments not raised before the district court are waived"); *see United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017) ("Failure to raise a claim to the district court 'constitutes a forfeiture, not a waiver, of that right for the purposes of appeal.'"). *Cf.* Fed. R. App. P. 28(a)(8)(A).

The Supreme Court has made clear that an argument that a particular finding by a state court is subject to § 2254(e)(1) as opposed to § 2254(d)(2) can be waived. *Brumfield v. Cain*, 576 U.S. 305, 322 (2015). In *Brumfield*, the Court considered

---

[21] The State did not raise the issue in a motion to reconsider, but instead in its motion to stay pending appeal, in support of the argument—rejected by the district court—that it was likely to succeed on appeal. ROA.3063, 3146. There is thus no ruling on the merits of the State's argument before the district court.

whether the state court's rejection of the petitioner's request for an *Atkins* hearing was unreasonable under § 2254(d), and found, despite the State's new argument that § 2254(e)(1) controlled, that the state court decision rested on unreasonable factual determinations in light of the record before it. *Id*. at 312. Because the State "did not press below the theory that § 2254(e)(1) supplies the governing standard," that argument was "deemed waived." *Id*. at 322. The State cites to no jurisprudence to the contrary.[22]

Waiver of an argument that the § 2254(e)(1) standard applies to a given type of finding by a state court is akin to waiver of a procedural defense. The State may waive or forfeit procedural defenses under AEDPA as long as they are not jurisdictional.[23] Indeed, "a federal [habeas] court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system." *Wood v. Milyard*, 566 U.S. 463, 472 (2012). *See Young v. Dretke*, 356 F.3d 616, 630 (5th Cir. 2004) (Jones, J., concurring) (noting that this Court is "not authorized to litigate the State's case").

---

[22] The State cites to *Langley v. Prince*, 926 F.3d 145, 162 (5th Cir. 2019), for the proposition that the § 2254(d) relitigation bar cannot be waived; however, an argument that a given type of finding is subject to § 2254(e)(1) can. *See Brumfield*, 576 U.S. at 322.

[23] *See Day v. McDonough*, 547 U.S. 198, 205 (2006) (interpreting § 2244(d)(1)); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir.1998) (interpreting § 2254(b)(3)); *Littlejohn v. Trammell*, 704 F.3d 817, 858 (10th Cir. 2013) ("Where the State fails to argue that the petitioner was less than diligent, . . . a diligence challenge is waived.") (interpreting § 2254(e)(2)). *See also Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994) (pre-AEDPA) (state waived procedural defense by failing to raise it in its answer).

**B. The State's Argument would have Failed Even if it had Been Preserved**

Even if the State had not waived this argument, it has no merit. This Court has examined state court findings of "strategy" under *Strickland* as subject to § 2254(d). *Wardrip v. Lumpkin*, 976 F.3d 467, 477 (5th Cir. 2020); *Morales v. Thaler*, 714 F.3d 295, 302-03 (5th Cir. 2013). In evaluating state court findings of "strategy," the Supreme Court has clarified that a federal court must consider both "[w]hether the state court reasonably determined that there was a strategic decision under § 2254(d)(2)" and "whether the strategic decision itself was a reasonable exercise of professional judgment under *Strickland* or whether the application of *Strickland* was reasonable under § 2254(d)(1)." *Wood v. Allen*, 558 U.S. 290, 304 (2010). Because the ultimate question of whether trial counsel's decision was based on a reasonable trial strategy is a mixed question of law and fact, which must apply the clearly established federal law on the subject, that determination should not be reviewed under § 2254(e)(1). *See Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009) (subjecting deficient performance prong of Strickland, including question of strategy, to § 2254(d)). *Cf. Jefferson v. GDCP Warden*, 941 F.3d 452, 474 (11th Cir. 2019) (reviewing "the reasonableness of a strategic decision *de novo*," and reviewing "the antecedent inquiry of whether the action was in fact a strategic one" as a question of fact).

**C. Clear and Convincing Evidence Rebutted the State Court's Finding that Trial Counsel's Omissions were Part of a Trial Strategy**

Had the district court subjected the state court's findings of strategy to the § 2254(e)(1) presumption of correctness, the ultimate ruling would have been the same. Mr. Neal presented clear and convincing evidence, based solely upon the record before the state court, sufficient to rebut the state court findings of strategy.

**1.  No Evidence before the State Court Supported its Finding of Strategy**

The following was before the state post-conviction court. At trial, the State's theory was that Zannie and Jarrell both entered the house, but that Jarrell was the "one killer." *See* ROA.7437-38, 7937-38. This theory was based solely on Darby's testimony. *See id.* In closing, the prosecutor emphasized to the jury that "what [Darby] told you was the truth." ROA.7936.

The defense theory at trial was less clear, as Barnett waived opening statement, ROA.7439, and told a meandering story about a matador in his closing argument, ROA.7941-43. Barnett did, however, make clear to the jury both in cross-examinations and in closing that Darby was the tall, slim person dressed in all black that Ms. Hurst saw in the house, and that Darby's testimony was untrue. ROA.7947.

Post-trial, Barnett stated in a sworn declaration that "I did not review the physical or forensic evidence in the case, and I did not use any experts in preparation for the trial." ROA.10250. He specifically did not recall whether he received the

serology and shoeprint evidence before trial but stated that he would have used them at trial if he had them. ROA.10251. The State produced no contrary evidence on the issue of strategy. In the two affidavits submitted by the State, there was no mention of Barnett's trial strategy. *See* ROA.3371-72. Indeed, the State did not even address Barnett's declaration in its response. Accordingly, there was no evidence before the state court to either rebut Barnett's sworn statement that he would have used the reports if he had them, or to support its ultimate conclusion that Barnett's failure to use the reports was trial "strategy."

### 2. The Declaration was Clear and Convincing Evidence Rebutting the Finding of Strategy

With this record before it, the state post-conviction court concluded, without holding a hearing or even entertaining argument, that trial counsel's failure to use the three items of evidence at issue was "strategic." The state court summarily found, without support, that "[c]ounsel's decisions were trial strategies which do not constitute ineffective assistance of counsel." ROA.17091-82.

The only evidence before the court on the issue of strategy was Barnett's declaration, and the trial transcript showing the defense and prosecution theories. The declaration is clear and convincing evidence that the failure to utilize the forensic reports was *not strategic*. Barnett himself characterized the reports as "exculpatory." ROA.10251. There was no evidence in the state court record to the contrary, and in fact, the record made clear that Mr. Neal's entire defense revolved

around the impeachment of Darby's credibility and Ms. Hurst's description of the

shooter as matching Darby.

### 3. There was No "Conflicting Evidence" that would have had any bearing on Barnett's Credibility

As the district court explained in its amended order granting relief:

> [T]he central point of this Court's holding was that *no* evidence was
> ever presented to show that trial counsel made a strategic decision not
> to present the shoeprint analysis report and the serology report. The
> only evidence presented on this issue was the affidavit of trial counsel,
> who attested that he would have used the evidence if he had received it.

ROA.3146 (emphasis in original). Conceding that it presented no evidence to rebut

the clear and convincing evidence of a lack of strategy, the State instead argues here

that there were "multiple reasonable interpretations" of Barnett's declaration. *See*

*State's Brief*, at 36. This argument is based on faulty logic rather than reasoned

alternative analyses of the evidence, which neither the state post-conviction court

nor the State can provide.

The State argues that Barnett's use of the term "forensic evidence" could be

interpreted to exclude the shoeprint and serology analyses. First, only an absurd

reading of the term "forensic evidence" would randomly *exclude* two entire

categories of forensic evidence.[24] Second, trial counsel specifically refers to the

serology and shoeprint reports in his declaration. ROA.10250-51. The State then

---

[24] Moreover, the record independently corroborates Barnett's statement that he did not review the
physical evidence. ROA.7858.

argues that, if this term includes—as it must—the shoeprint and serology reports, Barnett is not credible because he claims both that he did not review them but that if he had he would have used them. *State's Brief*, at 36-37. This argument, however, actually supports the fact that Barnett was not acting strategically; once he was shown these reports in post-conviction, he immediately recognized their importance and acknowledged that if he had received and reviewed them he would have used them, but he clearly had not. This does not reveal an attorney who was carefully reviewing discovery and making strategic decisions about what to use or not to use. This was an attorney who was unprepared for trial, with no investigator, no co-counsel, and no administrative support, trying a capital case against a prosecution with multiple attorneys, investigators, paralegals, secretaries, and law enforcement support. The State's interpretation conflicts with the plain language of the declaration, which was that trial counsel did not review the reports, but would have used them if he was aware of them.

The State also claims that the state court could have found Barnett incredible because it had been twelve years since trial. *State's Brief*, at 37. However, apparently unconcerned about his memory, the State submitted two affidavits from Barnett during post-conviction, one of which credited by the state court in its finding that Barnett's signature was affixed to the unattributed certified mail return receipt. ROA.3371-72, 17081. Length of time from trial was not an issue bearing on his

credibility. Notably, neither of the State's affidavits address counsel's strategy, indicating either that they asked if he had a strategic reason for failing to use this evidence and his answer was consistent with his declaration, or that they simply accepted the validity of his declaration. The State's newfound challenge to Barnett's credibility is a post-hoc strawman argument.

The state court did not make a "credibility determination" based on conflicting evidence. If the state court had held a hearing where Barnett's credibility was challenged, or even considered competing declarations from him, the state court would have had broad discretion to find him not credible.[25] But there was no hearing, no competing declarations. Instead, the state court simply ignored Barnett's declaration, without any contrary evidence presented by the State, and without hearing live testimony.[26] "This is not a credibility determination; this is speculation." *See Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 907 (8th Cir. 2014). The declaration itself, considered in context of the record as a whole, is sufficient to rebut the finding of strategy by clear and convincing evidence.

Finally, the State's argument that Mr. Barnett should be treated as a "recanting witness" has no support. When a witness recants his trial testimony, that recantation

---

[25] *See*, *e.g.*, *Pondexter v. Dretke*, 346 F.3d 142, 145 (5th Cir. 2003) (upholding decision of state court after holding an evidentiary hearing); *Richards*, 566 F.3d at 563.

[26] *See Whelchel v. Washington*, 232 F.3d 1197, 1205 (9th Cir. 2000) (noting that, "[s]ince the trial judge had no opportunity to personally observe [the witnesses], the statement is also not a credibility determination.").

is viewed with suspicion because it is tantamount to an admission of perjury. *Isaac v. Cain*, 588 F. App'x 318, 326 (5th Cir. 2014) (citing *State v. Prudholm*, 446 So.2d 729, 736 (La.1984). In contrast, this Court routinely considers trial counsel's post-trial statements as it would any ordinary witness.[27]

Ultimately, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698. This Court has explained that:

> The Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all. Rather, the fundamental legal question is whether, viewed with the proper amount of deference, counsel's performance was professionally reasonable in light of all the circumstances.

*Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). The district court's detailed and thorough decision, rendered after years of litigation and inquiry into the legal and factual issues, should be upheld.

## II.    Trial Counsel's Deficient Performance at this Capital Trial Rendered the Verdict Unworthy of Confidence

*Strickland* requires reviewing courts to consider whether trial counsel's strategy was objectively reasonable in light of all of the circumstances, including the

---

[27] *See Hughes*, 7 F.4th 388 (crediting trial counsel's admission of no strategy); *see also, e.g., Murphy v. Davis,* 737 Fed.Appx. 693 (5th Cir.2018) (basing findings of strategy largely on trial counsel's testimony at state post-conviction evidentiary hearing); *Dodson v. Stephens*, 611 Fed.Appx. 168 (5th Cir.2015) (same); *Allen v. Stephens*, 619 Fed.Appx. 280 (5th Cir.2015) (same).

extent to which trial counsel conducted investigation. 466 U.S. at 690-91. Here, nothing in the record indicated that trial counsel conducted any investigation, or even reviewed discovery, before trial. *See* ROA.10250-51. Even if his failure to make any use of the reports and statement was strategic, the district court did not clearly err in finding that any such strategy was objectively unreasonable. *See* ROA.2982. Ultimately, the only evidence that Jarrell Neal had the specific intent to kill required to support a first degree murder conviction and the penalty of death was Darby's testimony. Trial counsel's errors undermined confidence in the verdicts as to both guilt and penalty. *See Strickland*, 466 U.S. at 694.

## A. The State Court Unreasonably Applied Clearly Established Federal Law Requiring Courts to Determine Whether Trial Counsel's Strategy is *Objectively Reasonable*

Clearly established federal law requires a reviewing court to determine not only whether counsel made a strategic decision, but whether that decision was reasonable based on the investigation that preceded it. *Strickland,* 466 U.S. at 690-91 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Purportedly tactical decisions not preceded by reasonable investigations are not sufficiently informed and thereby not entitled to the "deference typically afforded" to trial counsel's decisions. *Escamilla v. Stephens*, 749 F.3d 380, 392–93 (5th Cir. 2014); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir.

1995) ("[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel.").

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court found the state court's finding that trial counsel made a strategic decision to focus on Wiggins' lesser responsibility rather than evidence of his background and history to be unreasonable under § 2254(d)(1). *Id.* at 518. The Court held that counsel's lack of investigation rendered the strategy unreasonable. *Id*. at 535, 538.

> Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id*. at 527. The Court found that counsel's decision to stop investigating fell short of prevailing professional standards, and, based upon what was contained in the information counsel *did* acquire, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 524-25. As a result, the Supreme Court concluded that the state court's denial of the claim was an unreasonable application of federal law. *Id.* at 534.

A defense counsel's duty to investigate includes efforts to secure relevant information in the possession of the prosecution and law enforcement authorities.[28]

---

[28] ABA STANDARDS FOR CRIMINAL JUSTICE: DUTY TO INVESTIGATE AND ENGAGE INVESTIGATORS

In *Rompilla v. Beard*, the Court made clear that "[n]o reasonable lawyer" would forego examination of a file he knows the prosecution will cull for aggravating evidence. 545 U.S. 374, 389 (2005). The minimum obligation of counsel is to review the prosecution's files, especially when the files are "open for the asking." *Id. Cf.* ROA.7858.

"To do no investigation at all on an issue . . . is not a tactical decision. Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum." *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990) (quoting *Powell v. Alabama*, 287 U.S. 45, 58 (1932)); *see also Anderson v. Johnson,* 338 F.3d 382, 392 (5th Cir. 2003) (finding deficient performance and an unreasonable application of clearly established law where counsel relied on discovery and did not interview witnesses); *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985) (attorney had no viable reasons for his failure to investigate); *Kemp v. Leggett*, 635 F.2d 453, 454 (5th Cir. 1981) (granting habeas relief where counsel failed to interview single eyewitness or character witnesses).

This Court has been particularly skeptical of a state court's finding of strategy where trial counsel has *admitted* that there was no strategy behind a decision. In *Hughes v. Vannoy*, this Court affirmed a grant of habeas relief arising out of an ineffective assistance of counsel claim, where the murder conviction rested primarily

---

4–4.1(c) (4th ed. 2015).

on the testimony of an eyewitness who contradicted the defense that the gun had gone off accidentally. 7 F.4th 380 (5th Cir. 2021). This Court found that trial counsel was ineffective for failing to interview the eyewitness and call another witness who would have impeached her testimony that she witnessed the incident. *Id*. at 392. The Court highlighted defense counsel's admission "that there was no strategy behind his decision not to even attempt to interview [the witness]." *Id*. at 388. "Given the importance of [the witness'] testimony to the State's case and the value of [the roommate's] impeachment testimony," this Court found that no fairminded jurist could conclude that the failure to impeach the witness would not have undermined confidence in the outcome of trial. *Id*. at 392.

## B. The State Court Decision on the Deficient Performance Prong Rested on an Unreasonable Application of Clearly Established Federal Law

To determine whether trial counsel's performance fell below constitutional standards, this Court must first look at the defense strategy at trial. The State's case that Jarrell Neal entered the house and shot the victims was based primarily on Darby's testimony that "the defendant exited the 4–Runner with an AK–47 and he and Zannie went inside the residence." *Neal*, 796 So. 2d at 658. *See also id.* at 657–58 (stating that "the primary evidence that the defendant was the shooter is the trial testimony of the defendant's uncle, Arthur Darby."). On the other hand, the defense theory was that Jarrell Neal "waited in the 4–Runner while Arthur Darby and Zannie Neal went inside the house and that Darby shot the victims." *Id*. Noting that Ms.

Hurst's description of the shooter matched Darby's build and clothing, the court found that, nevertheless, "positive identification by only one witness [Darby] is sufficient to support a conviction." *Id.* at 658 (citing *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988)).[29] "[T]he jury heard Hurst's description of the offender and the witnesses' testimony regarding the defendant's and Darby's clothing and physique, but, nevertheless, accepted Darby's testimony implicating the defendant." *Id.*

Impeaching Darby's credibility, therefore, was key to the defense at trial. And, trial counsel tried, by shouting at Darby and accusing him of being the killer. *See* ROA.7809. But what trial counsel did not do was review and investigate the serology and shoeprint reports and review and identify the key inconsistencies in Darby's February 22 statement. The State argues that counsel made a reasonable strategic decision not to impeach Darby with these three items, but this argument is unsupported, and, in places, flatly contradicted by the record.

### 1. Serology Analysis

The jury heard nothing regarding the State's serology analysis at trial. The State claims that defense counsel made a "strategic" decision not to address the blood

---

[29] Although the *Mussall* court explained that a single eyewitness may be sufficient to support a conviction, the court's holding was that the evidence was insufficient given the numerous inconsistencies and lack of corroboration. *Mussall*, 523 So.2d at 1311. This holding further supports the prospect that, had trial counsel competently impeached Darby, there may not have been sufficient evidence to support a conviction for first degree murder or death sentence.

on Darby's shoes because the prosecution could have argued that the blood was the result of Darby being attacked by the K9 unit, or attempting to draw attention away from the blood on Jarrell Neal's shoes. This Court should reject those arguments.

First, that the prosecution may have attempted to explain away the blood does not mean trial counsel should not have pointed to it as evidence that Darby was at the scene of the crime and not in the car as he claimed. *See*, *e.g.*, *Hughes*, 7 F.4th at 389 & n. 33 (rejecting state's hypothetical strategic reasons that were never claimed by trial counsel). Second, the uncontradicted evidence before the state court was that trial counsel did not review the serology analysis prior to trial, did not consult with any forensic experts regarding the serology analysis, and did not conduct any independent testing of the samples set aside by the State for DNA analysis. *See* ROA.10250. Had counsel taken the minimal step of cross-examining the State's witnesses regarding the blood on Darby's shoes, it would have allowed counsel to argue that Darby was lying when he said he never entered the house. Had counsel taken the next bare-minimum step in trial preparation, counsel could have hired an expert to conduct DNA testing. Then, combined with the shoeprint indicating that Zannie Neal had been inside the house, counsel could have argued that Jarrell Neal was excluded as the shooter. *See* ROA.3047.

Finally, the trial record rebuts the State's argument that trial counsel could have been afraid of drawing out evidence that Jarrell Neal had blood on his work

boots. Trial counsel repeatedly asked broad, open-ended questions to the prosecution's witnesses regarding the forensic evidence without any concern for "risk." During direct examination, the prosecutor asked Lt. Buras whether "anything that [he] learned point[ed] to anyone other than Jarrell Neal committing these homicides." ROA.7840. Lt. Buras responded "No, sir." *Id*. On cross-examination, trial counsel asked "Why aren't we being shown *all the analysis on everything* that you have sent to a lab?" ROA.7852 (emphasis added). Lt. Buras responded that, aside from the GSR analysis, "[a]ll the other evidence is negative on all three defendants." ROA.7853. On redirect, the prosecutor asked Lt. Buras whether trial counsel could have been given access to the physical evidence in this case to conduct independent examination and testing, to which Lt. Buras responded that all he had to do was ask. ROA.7858. "[A]t no time," however, did trial counsel request to test or even review the evidence. *Id*.[30]

This Court considered a similar situation in *Rhodes v. Vannoy*, 751 F. App'x 524 (5th Cir. 2018) (per curiam). In *Rhodes*, the state's case rested heavily on an eyewitness who identified the defendant out of a lineup. The witness had recently undergone surgery but denied being under the influence of any medication on cross-

---

[30] *See* ABA STANDARDS FOR CRIMINAL JUSTICE 4–4.1 (2d ed. 1982 Supp.) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction"); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, GUIDELINE 11.4.1.D.4.

examination, however, trial counsel did not impeach him with medical records showing the opposite. *Id.* at 525. This Court rejected the State's contention that "counsel might have been tactically limiting the scope of her cross-examination" and held that it was not a reasonable strategy to ask the victim about his use of pain medications at the time of the identification, but then not impeach him with available medical records after the victim denied being on any medication. *Id.* at 530.

## 2. Shoeprint Analysis

After the State elicited evidence from Detective Sacks regarding the shoeprint, trial counsel asked if he knew what happened to the tile, and was given the evasive response that "some analysis was done." ROA.7737.

He continued to press:

Q.    And do you know what that analysis revealed?

A.    I think it came back negative.

Q.    Okay.  So getting of the tile, which had some red, I guess a red type or dark brown type of coloration, that came back, they didn't know what that was?

A.    No, I think they determined it's blood on the tile, but as far as being able to match it to something, I don't think they were able to match it to an actual shoe.

ROA.7737-38. Later, Det. Sacks acknowledged that the bloody shoeprint pattern was "very important," and counsel asked:

Q.    Okay. But you don't know what the results of that pattern did to help these ladies and gentlemen of the jury know whose print it made?

38

A.     From talking to Lieutenant Buras, **I understand that it's negative**--

Q.     Okay.

A.     --which means that it--

Q.     Okay.

A.     --they didn't match.

ROA.7743.

Barnett was not trying to hide the results. Had Det. Sacks answered this line of questioning accurately, he would have acknowledged that the results were not negative, as, in fact, Zannie's shoe had not been excluded. Even given his actual obfuscating answer, Barnett would have readily impeached him had he read the report. *See* ROA.10251. But, Barnett had not reviewed the shoeprint report and thus did not impeach the detective with it.

In closing arguments, trial counsel attempted to highlight the bloody shoeprint: "there was a [tile] with a shoeprint. Where is that? Whose shoe was that? Is that his? Is it Zannie Neal's? Is it Arthur Darby's? . . . Where's their clothing? Where's the blood?" ROA.7948. If counsel had reviewed and investigated the JPSO shoeprint and serology analysis, he could have argued to the jury that out of the three codefendants, Zannie and Darby's shoes put them at the scene.

These analyses would have supported the defense theory, which featured Darby as the shooter and Zannie as the second person in the house. Trial counsel's

39

failure to bring that to the jury's attention was inconsistent with his actual trial strategy.

### 3. Darby's February 22 Statement

The State claims that Darby's February 22 statement contained only "two inconsistencies" from his trial testimony,[31] and that "the inconsistent statement Neal's counsel did introduce was . . . the stronger of the two," *State's Brief*, at 44. This argument fails for several reasons. As a general matter, counsel had no strategy in pulling punches when it came to impeaching Darby, who the defense was attempting to portray as both a liar and the real killer. Additionally, the statement contained numerous inconsistencies from Darby's trial testimony which would have impeached his credibility before the jury. These inconsistencies include, but are not limited to, giving a different timeline, omitting mention of avoiding the police, lying about how he knew his own nephew, lying about his familiarity with the area, and indicating that Zannie, not Jarrell, instigated this incident. *See* ROA.66-73

Most egregiously, Darby's testimony that Jarrell Neal got out of the car *holding the murder weapon* went unchallenged. The State's opening statement put trial counsel—and the jury—on notice that Darby's testimony that Jarrell got out of the car carrying a rifle would be a hallmark of the State's case. *See* ROA.7436 ("And

---

[31] At trial, the State claimed that there were *no* inconsistencies between Darby's April 1, 1998, and February 22, 1999 statements. ROA.7780.

as they get out, [Darby's] going to tell you he sees Jarrell Neal with that Mack 90, semi-automatic rifle"). During direct examination, Darby testified that Jarrell was carrying an AK-47 in his hands when he got out of the car. ROA.7796-7797. Darby identified the MAK-90 as the rifle Jarrell was carrying when he got out of the car, and the prosecutor hammered:

**Q. And who had this rifle when they got out the car that night?**

**A. Jarrell.**

ROA.7797. Despite having a statement Darby made just days earlier that he did not see a gun when Jarrell got out of the car, trial counsel made no mention of this impeachment evidence during his six-and-a-half-page cross-examination. *See* ROA.7807-7814. Just days before, Lt. Buras asked Darby: "**What kind of gun did Jarrell have in his hand when he got out?**" and Darby responded: "**I didn't see [a gun] when he got out.**" ROA.3349. To be clear, Lt. Buras asked again: "**Did you notice any weapons when they first got out?**" Darby responded "**No**." ROA.3350. This failure to impeach the State's only witness on the issue of identity of the shooter, on the issue of whether Jarrell was carrying the murder weapon towards the scene, is inexcusable.

The trial transcript shows that trial counsel's goal was to paint Darby as a liar and as the true killer. The inconsistencies noted above would have furthered, rather than detracted from, that goal. This is not a case where trial counsel chose a trial

strategy that turned out to be less than successful—this is a case where trial counsel utterly failed to do the bare minimum of preparation for this capital trial. *See Rhodes*, 751 F. App'x at 530 (considering the state's reliance on the witness to prove its case, counsel's failure to impeach the witness was not "sound trial strategy" and prejudiced the defense). This is a case where trial counsel failed to even review the physical evidence or forensic reports purportedly given to him in discovery, and failed to make use of critical impeachment evidence. Mr. Neal has satisfied his burden of showing deficient performance.

### C. The State Court's Finding as to Prejudice was Objectively Unreasonable—Counsel's Errors Undermine Confidence in the Verdicts

Because there was no physical evidence connecting Jarrell Neal with the murder, Darby's testimony was the "cornerstone of the state's case in chief." *See Neal*, 796 So. 2d at 657–58; *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) (counsel was ineffective for failing to interview the two eyewitnesses). In fact, the only physical evidence connecting *anyone* directly to this crime implicates Mr. Neal's two co-defendants—Darby and Zannie—and trial counsel inexplicably failed to use it. As the district court found, this evidence was "clearly material" and "the importance of the serology report to the defense cannot be overstated." ROA.2313-14. If the jury had heard that physical evidence inculpated the other co-defendants,

and that just days before, Darby had denied seeing Jarrell Neal with a weapon, there
is a substantial likelihood there would be a different result.

### 1. The State Misunderstands the Law of Principals

The State insists that trial counsel's unprofessional errors are harmless
because under Louisiana law, Jarrell Neal was still a principal to the first-degree
murders of Fergus Robinson and Greg Vickers. *State's Brief* at 45-47. But the State
rests this assertion on a flawed understanding of state law and an untested belief that
the State could prove its case under an entirely different theory beyond a reasonable
doubt.

In Louisiana, all people concerned in the commission of a crime are not
automatically guilty of the same grade of offense; a person can be convicted only of
a crime for which he has the necessary mental state. First degree murder requires
specific intent to kill, while second degree murder includes "felony murders" not
requiring specific intent. La. Rev. Stat. §§ 14:30, 14:30.1. Principal liability does not
dispose of the requirement of proof of the requisite intent beyond a reasonable doubt.
*State v. Brooks*, 505 So. 2d 714, 717 (La. 1987).

In *State v. West*, the Louisiana Supreme Court reversed a first degree murder
conviction on the basis of a jury instruction that "did not clearly point out to the jury
that it had to find specific intent [to kill] on the part of *this* defendant." 568 So. 2d
1019, 1024 (La. 1990). It is not enough to find merely that a co-defendant had the

necessary mental state, since this intent cannot be imputed to the accused. *Brooks*, 505 So. 2d at 717. In order to prove that Jarrell Neal was a principal to first degree murder, the State would have had to prove beyond a reasonable doubt that he *personally* had the specific intent to kill Greg Vickers and Fergus Robinson.[32]

The State's theory that because a jury might have found that Mr. Neal shot at law enforcement vehicles during the police chase,[33] it would have imputed specific intent to kill Mr. Robinson and Mr. Vickers, is not supported by Louisiana law. These are two distinct, separate acts. The Louisiana Supreme Court has made clear that the specific intent to kill applies only to the victims who are harmed in "a single consecutive course of conduct," which the courts have applied in cases where multiple people are harmed in the same room, or within seconds of each other, in one single event. *See, e.g.*, *State v. Sonnier*, 402 So. 2d 650 (La.1981) (two victims laying side by side shot and killed); *State v. Monroe*, 397 So. 2d 1258 (La.1981) (two victims stabbed in the same apartment); *State v. Martin*, 376 So. 2d 300 (La.1979) (defendant killed one person, then "immediately" killed three others).[34]

---

[32] Moreover, the State would not have been able to establish the extremely high level of culpability to impose the death penalty. *Cf. Brady*, 373 U.S. at 88 (evidence material not to guilt or innocence, but to the relative culpability of one co-defendant over another, where both would arguably have been principals to murder).

[33] Mr. Neal was not tried for a crime relative to any shooting during the police chase.

[34] Conversely, where someone has expressed intent to kill multiple people, but at the time of the homicide only one was present and their actions could not have affected or struck a second person that was not in the vicinity, the court has found that "no rational trier of fact could [conclude] beyond a reasonable doubt" that there was specific intent to kill the second person who was not

In any event, the State's new theory must be reserved for a new trial, as this would be a complete change in the State's case. The prosecutor acknowledged in rebuttal closing arguments that its theory as to specific intent, required for principal liability, was based on Darby's testimony that Jarrell had the rifle when he went into the house. ROA.7967. The State would not have been able to make this argument without Darby. Since Mr. Neal's trial in 1999, the State has maintained that it was Zannie and Jarrell Neal that entered 1333 Wilson Street; it is only now, in the face of mounting physical evidence that it was actually Darby who left the car with Zannie while Jarrell stayed in the vehicle, that the State claims it did not need Darby. The State's new theory of Jarrell Neal's alleged culpability cannot be imposed without holding the State to its burden at a new trial.

### 2. Given the Paltry Defense Case at Trial, and the Fact that the State's Case for First Degree Murder Rested on Darby's Credibility, Counsel's Omissions Prejudiced the Defense

Both the State and defense theories centered on one vital point: who entered 1333 Wilson St. the night of the murders, and who stayed in the car. The State contended that Arthur Darby remained in the car, while Jarrell and Zannie Neal entered the home. This theory culminated in the State's closing argument, where it told the jury that it was Jarrell Neal, "armed to the teeth" with the MAK-90, that

---

present. *State v. Andrews*, 452 So.2d 687, 689 (La.1984).

went into the home with his brother and killed both victims. ROA.7920-22. Critically, throughout the entirety of trial, the State contended that only *two* people entered the house, and *one* person stayed in the car outside.

In contrast, defense counsel's case was clear on this point: Claudette Hurst saw one tall, slim man dressed in all black, and that description matched Arthur Darby, *not* Jarrell Neal. ROA.7516-7517, ROA.7947.

Under either theory, only two people entered that home that night, and Barnett had forensic evidence that tied both Zannie and Darby to the inside of 1333 Wilson St., eliminating the possibility that Jarrell Neal could have been one of them and undercutting the State's theory entirely. Utilizing the shoeprint report would have not only discredited the testimony of one of the lead detectives, Detective Sacks, who claimed that the shoeprint was not matched to any of the defendants, ROA.7737-38, 7742-43, but it would have been objective, scientific evidence for the jury to consider as they determined who went inside. The serology report could have answered defense counsel's own question in closing argument—"Where's the blood? You shoot people at close ranges…. blood is going to squirt out"—because the answer was, per the report, on Darby's shoe. ROA.7948.

Finally, on one point, the State and the defense agreed: without Darby's testimony, the State "had nothing." ROA.7950. The prosecutor recognized that Darby's testimony was the lynchpin of the case; in acknowledging that it was

"distasteful" that Darby's was given a plea agreement, he felt he "had no choice" but to do so, essentially admitting the State could not have successfully convicted Jarrell Neal of first degree murder and imposed the death penalty without Darby's testimony. ROA.7935-36. This is true; Darby's testimony was the *sole* evidence supporting the theory that Zannie and Jarrell were the perpetrators that entered the home. And though the prosecutor alleged he was "not vouching" for Darby's credibility, in the next breath he urged to the jury that "what [Darby] told you was the truth." ROA.7936.[35] He admitted to the jury that there was one inconsistency in Darby's statement, but stressed several times "**that's the only thing that's inconsistent**." ROA.7938. The jury overlooked Darby's faults as a witness and convicted Jarrell Neal. Yet, the jury never heard the statement from this key witness, taken days before, denying seeing Jarrell with a weapon when he left the car. This allowed the prosecutor to hammer to the jury in closing arguments:

> **Jarrell Nea**l, the man seated before you (pointing to defendant) the man on trial for two counts of first degree murder, **exited that vehicle with that (pointing) MAK-90 assault rifle, fully loaded**.

ROA.7937.

> **And you know what the important part in that [Arthur Darby's] statement was**? That same night, the same night he's arrested he tells the police he was the get-away driver. And he tells them more

---

[35] In a recent dissent, Justice Sotomayor called attention to this same prosecutor's practice of vouching for witnesses. *Anthony v. Louisiana*, 598 U.S. __ (Nov. 7, 2022) (Sotomayor, J., dissenting from the denial of certiorari).

importantly **who left the car with military weapon designed for death. Who had it in his hands? Jarrell Neal**.

ROA.7954.

And remember the statement way back when that he gave the night it happened, before he [Arthur Darby] had any deal, was that he **[Jarrell Neal] left the car with this weapon.** That's the same statement he told you today.

ROA.7957.

And we proved to you **who had the gun immediately before the killing**. And we proved to you who had the gun seconds after the killing, **it's Jarrell Neal** ..... You can infer that the person who had this gun, was the same person who had the gun for the killings.

ROA.7963.

The State now argues that because Darby admitted he was trying to avoid the death penalty and the jury was aware of his plea, defense counsel was not ineffective for failing to further impeach him. *State's Brief*, at 48-49. Some minimal cross-examination—approximately six transcript pages of the State's key witness at a capital trial—does not ameliorate the prejudice suffered. *See Richards*, 566 F.3d at 568 (counsel was ineffective for failing to "meaningfully bring out the significant differences" in key witnesses' accounts); *Bryant,* 28 F.3d at 1418-19 (even where trial counsel's cross examination was effective, "that is not to say it could not have been improved" by additional evidence, especially where the witness being examined was "the cornerstone of the state's case in chief"); *Harrison v. Quarterman*, 496 F.3d 419, 427 (5th Cir. 2007) (though defense counsel cross-

examined the victim and even called their own witness to impeach her, counsel was ineffective for calling a second witness to impeach her on the same point when there were some differences and the case "turned on witness testimony"). Similarly, the accomplice instruction given to the jury does not remedy counsel's deficiencies. *State's Brief*, at 49. In fact, this instruction further demonstrates the prejudice: the jury was explicitly instructed that it *could* convict based solely on Darby's testimony if it found him reliable. This jury was deprived, however, of hearing valuable impeachment that would have helped them determine his true credibility.

But for trial counsel's failure to address these contradictions, the jury would have heard that Darby lied repeatedly—most crucially, about seeing Jarrell get out of the car with a gun in his hands—and, during deliberations, determined his credibility in conjunction with forensic evidence putting both Darby and Zannie at the scene of the crime.

To prove prejudice, Mr. Neal must show that counsel's deficient performance undermined confidence in the verdict of either guilt or penalty, by less than a preponderance of evidence. *See Williams*, 529 U.S. at 406; *Strickland*, 466 U.S. at 694. As the district court found, the state court's decision on prejudice was unreasonable. ROA.2983-87. The state court reasoned that this evidence was not "exculpatory," and thus counsel's failure to use it had no prejudicial effect. This is not the correct standard; when determining prejudice, a court must not consider

whether the evidence conclusively answers the central question of guilt or innocence, but whether "there is a reasonable probability that," had the evidence been used, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 406.[36] Witness-impeachment material falls squarely into the type of evidence that this Court has determined can be prejudicial, even when it does not speak directly to the guilt or innocence of a defendant. *See Hughes*, 7 F.4th at 389; *Rhodes*, 751 F. App'x at 525.

The state court's finding of lack of prejudice was also based on its misunderstanding that Mr. Neal was a principal to this crime. ROA.17082. As explained above, this is not a correct application of Louisiana's law of principals—and even if it were, it is contrary to the trial record before the court. Finally, the state court entirely failed to determine whether trial counsel's use of this evidence could have affected the death sentence imposed in this case—even assuming *arguendo* that Mr. Neal was convicted as a principal, his actual role in the incident speaks to his level of culpability, as seen by the State's willingness to allow Darby to plead to a crime that found him released from prison in 2015, as Mr. Neal began his federal habeas litigation under a death sentence.

---

[36] This Court has adopted the *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) standard as "identical to" the prejudice standard for ineffective assistance of counsel claims. *Johnson*, 68 F.3d at 109-10.

As found by the district court, Mr. Neal "could not have been convicted of first-degree murder without the testimony of Arthur Darby," and "no fair-minded jurist could conclude" that Barnett's failure to impeach him with the forensic reports and his own inconsistencies did not undermine confidence in the verdict. ROA.2987. Mr. Neal has carried his burden of proving that the state court's decision on the prejudice prong was unreasonable, and that there is a reasonable probability that he was prejudiced as a result of his counsel's deficient performance.

## CONCLUSION

For the foregoing reasons, Mr. Neal respectfully urges that this Court affirm the decision of the district court. Alternatively, Mr. Neal requests that this Court find that counsel's deficient performance prejudiced him as to penalty. In the event that this Court reverses or amends the district court's ruling, Mr. Neal requests a remand for consideration of his remaining claims.

Respectfully submitted,

s/ Cecelia Trenticosta Kappel
Cecelia Trenticosta Kappel, Bar No. 32736
1024 Elysian Fields Ave.
New Orleans, LA 70117
(504) 529-5955
*ctkappel@defendla.org*

Rachel I. Conner, Bar No. 29726
3015 Magazine Street
New Orleans, LA 70115
(504) 581-9083

51

*rachel@connerdefense.com*

*Counsel for Jarrell Neal*

## CERTIFICATE OF SERVICE

I certify that on November 14, 2022, the foregoing Appellee's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to counsel for the Appellant. "The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

/s Cecelia Trenticosta Kappel
Cecelia Trenticosta Kappel

# CERTIFICATE OF COMPLIANCE

According to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies as follows:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12897 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font for text and 12-point font for footnotes.

3.  This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4.  This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5.  This brief is free of viruses because it has been scanned for viruses with Webroot SecureAnywhere version 9.24 in compliance with 5th Cir. ECF Filing Standard A(6).

/s Cecelia Trenticosta Kappel
Cecelia Trenticosta Kappel
Dated: November 14, 2022